**TAXATION WITH REPRESENTATION OF WASHINGTON, Appellant,**

v.

**Donald T. REGAN, Secretary of the Treasury, et al.**

No. 79–1464.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Oct. 14, 1981.

Decided March 26, 1982.

John Cary Sims with whom Alan B. Morrison and Thomas F. Field, Washington, D. C., were on the brief for appellant.

Frank P. Cihlar, Atty., Dept. of Justice with whom John F. Murray, Acting Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty. at the time the briefs were filed, Michael L. Paup and Richard Farber, Attys., Dept. of Justice, Washington, D. C., were on the brief for appellees. Ernest J. Brown, Leonard J. Henzke, Jr. and Philip I. Brennan, Attys., Dept. of Justice, Washington, D. C., also entered appearances for appellees.

Before ROBINSON, Chief Judge, and WRIGHT, TAMM, MacKINNON, ROBB, WILKEY, WALD, MIKVA, EDWARDS, and GINSBURG, Circuit Judges.

MIKVA, Circuit Judge:

 Taxation with Representation of Washington (Taxation) challenges the lobbying restrictions on certain nonprofit organizations required by Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), as a violation of its First

Amendment and equal protection rights. The whole of Taxation's argument well exceeds the sum of its parts. Taxation's case is weak if it is viewed solely as a First Amendment claim, because the Constitution does not require Congress to subsidize First Amendment activity. Taxation also has a weak case solely in terms of equal protection; Congress has vast leeway under the Constitution to classify the recipients of its benefits and to favor some groups over others. But a First Amendment concern must inform the equal protection analysis in this case. Courts must scrutinize with special care any act by Congress that facilitates the speech of one speaker over another, even when legislation is enacted in the dry, classification-ridden context of the Internal Revenue Code. By subsidizing the lobbying activities of veterans' organizations while failing to subsidize the lobbying of Taxation and other charitable groups, Congress has violated the equal protection guarantees of the Constitution. The district court erroneously rejected Taxation's constitutional challenge, and we accordingly reverse.

Because this case is complex, it may be useful to set out in advance the path that our reasoning follows. The opinion begins with an explanation of the internal revenue provisions at issue (cited as I.R.C. or by Section) and the discrimination established by those provisions. In the second part of the opinion, we explain why the statute's classifications must be given close judicial scrutiny. The third section then identifies and assesses the substantiality of the governmental interests said to justify the discrimination, and concludes that the statute is unconstitutional. The final section of the opinion discusses the appropriate remedy for this violation and the need for a remand to the district court.

## I. BACKGROUND

Taxation is a nonprofit charitable and educational organization that was formed to represent the general public on tax issues before Congress, the courts, and the executive branch.[1] After its incorporation in June 1977, Taxation applied to the Internal Revenue Service (IRS) for a declaration that it was an organization described in Section 501(c)(3).[2] Although Taxation oth-

---

1. Taxation was created as the result of a merger between two other organizations, Taxation with Representation Fund (TWRF), a group devoted to courtroom advocacy, and Taxation with Representation (TWR), a group devoted to legislative activity. TWR had been incorporated in 1970 as a social welfare organization exempt from federal income taxes under Section 501(c)(4), 26 U.S.C. § 501(c)(4) [hereinafter cited as I.R.C.], but liable for unemployment taxes and ineligible for tax deductible contributions under I.R.C. § 170. In 1974, TWR was denied classification as a Section 501(c)(3) organization, and appealed unsuccessfully in *Taxation with Representation v. United States*, 585 F.2d 1219 (4th Cir. 1978), *cert. denied*, 441 U.S. 905, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979).

 Taxation apparently absorbed the functions of TWR after TWR lost its appeal, *see* Brief for Appellee United States (IRS Brief) at 4, and Taxation makes the same claims here that were rejected by the Fourth Circuit. Despite this close relationship between issues and parties, however, the government has not pleaded or argued that Taxation should be precluded by res judicata from litigating this case, and we decline to reach the question *sua sponte.*

 Several litigants in this and other courts have also unsuccessfully raised issues related to

those we decide here. *See, e.g., Christian Echoes National Ministry, Inc. v. United States*, 470 F.2d 849 (10th Cir. 1972), *cert. denied*, 414 U.S. 864, 94 S.Ct. 41, 38 L.Ed.2d 84 (1973) (religious organization challenged loss of exemption as result of substantial legislative activity as violation of free exercise clause); *Haswell v. United States*, 500 F.2d 1133 (Ct.Cl. 1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 779, 42 L.Ed.2d 803 (1975) (taxpayer sued for refund on theory that his contributions to organization that engaged in extensive lobbying should have been deductible as charitable contributions); *Tax Analysts & Advocates v. Shultz*, 376 F.Supp. 889 (D.D.C.1974), *app. dismissed mem. sub nom. Tax Analysts & Advocates v. Simon*, 512 F.2d 992 (D.C.Cir.1975) (suit for declaratory judgment that legislative activity restrictions of Section 501(c)(3) were unconstitutional dismissed because action barred by I.R.C. § 7421(a), barring suits to restrain or enjoin collection of taxes). Taxation with Representation was also a party to the latter suit, but its complaint was dismissed without prejudice. *See* 35 A.F.T.R.2d 1352.

2. Section 501(c)(3) applies to:

 Corporations, and any community chest, fund, or foundation, organized and operated

erwise qualified for tax-exempt status under that section, it did not meet the requirement that "no substantial part" of its activities consist of "attempting to influence legislation." The IRS specifically found that Taxation's "stated purposes include attempting to influence legislation, and legislative advocacy may constitute a substantial part of your activities." Notification of Adverse Ruling, February 14, 1978, Joint Appendix (J.A.) 48. As a result, Taxation was ineligible for several tax benefits provided by Section 501(c)(3), particularly the eligibility to receive tax-deductible contributions from donors.[3]

Taxation exhausted its administrative remedies, and then sought in May 1978 to overturn the IRS decision by bringing a declaratory judgment action under I.R.C. § 7428.[4] Upon consideration of cross-motions for summary judgment, the district court ruled for the defendants. Memorandum Opinion, January 31, 1979, J.A. 56–64. Taxation appealed the district court's decision, and a three-judge panel of this court decided on April 14, 1981, to uphold the trial court. On June 11, 1981, a majority of the full court of appeals voted to vacate the panel opinion and rehear the case *en banc.*

## A. The Statutory Scheme

Before considering the issues presented by this case, it is first necessary to examine the classifications that are under review. Congress has excluded various types of organizations from the taxing provisions of the Code, and I.R.C. § 501 "is the linchpin of the statutory benefit system." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 29 n.1, 96 S.Ct. 1917, 1920 n.1, 48 L.Ed.2d 450 (1976). This section describes several dozen kinds of organizations that are exempt from federal taxation on the income they receive.

There are other important components of the tax benefits provided by Section 501 in conjunction with other provisions of the Code, however. The chief source of income for many of the nonprofit organizations described in the statute is private contributions. In order to encourage such giving, Congress has frequently provided that contributors to various Section 501(c) organizations may take a deduction based on the amount of the contribution. Because the Code imposes three general taxes on individuals—on income, gifts, and estates—the provisions allowing contributors to take these deductions appear in three separate portions of the Code. *See* I.R.C. §§ 170, 2055, 2522. Aside from this complexity, however, the general scheme is simple. Congress has accorded certain organizations a double benefit: exemption from taxes on their own income, and eligibility to receive contributions and gifts that are deductible from the donors' taxes as well. Throughout this opinion, tax exemption refers to the first benefit, and tax-deductibility to the second.

Every organization described in Section 501 enjoys some form of tax exemption, but only some are eligible to receive tax-deduct-

---

exclusively for religious, *charitable,* scientific, testing for public safety, literary, or *educational* purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, *no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation* (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

(emphasis added). Such organizations are exempt from taxation under the income tax subtitle unless such exemption is denied under I.R.C. §§ 502, 503, and 504.

3. *See* I.R.C. § 170(c). Other tax benefits accruing to a § 501(c)(3) organization include exemption from federal social security taxes (FICA), I.R.C. § 3121(a), and exemption from federal unemployment taxes (FUTA), I.R.C. § 3306.

4. I.R.C. § 7428 authorizes certain courts to issue declaratory judgments in appropriate cases relating to the status and classification of organizations under I.R.C. § 501(c)(3). Congress enacted this section of the Code as part of the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520.

ible contributions. The status of any particular organization, of course, can only be ascertained by examining the other portions of the Code that provide deductions to the organization's donors. A further complication lies in the fact that the Code differentiates among those organizations eligible to receive tax-deductible contributions in terms of the uses to which the organization's income may be put. For the purposes of this case, the crucial distinction promoted by Section 501 is between organizations that may not receive tax-deductible contributions if they lobby substantially, and organizations that may receive such contributions even if they do.

Section 501(c)(3) organizations—sometimes simply called "charitable" organizations—are examples of the former. A donor to such an organization may deduct his contributions to it by virtue of the relevant provisions in the Code. See I.R.C. § 170(c)(2) (income tax deductions); I.R.C. §§ 2055(a)(2), 2106(a) (estate tax deductions); I.R.C. § 2522(a) (gift tax deductions).[5] The Code limits the amount of lobbying that may be conducted by the Section 501(c)(3) organization, however, whether or not the lobbying is related to its exempt purpose.[6] See Slee v. Commissioner, 42 F.2d 184 (2d Cir. 1930). Section 501(c)(4) organizations, on the other hand,

5. I.R.C. § 170(a) states the "general rule" that deductions shall be allowed for "any charitable contribution" defined in subsection (c). Section 170(c) defines "charitable contribution" as a contribution or gift to or for the use of

(2) A corporation, trust, or community chest, fund, or foundation—

(A) created or organized in the United States or any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

(D) *which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation,* and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

(emphasis added). Similar language permits donors to make analogous deductions with respect to gift tax, I.R.C. § 2522(a)(2) (citizens or residents) and (b)(2) (nonresident aliens), and estate tax, I.R.C. §§ 2055(a)(3) (citizens or residents) and 2106(a)(2)(A)(ii) (nonresident aliens). Gift and estate tax deductions will soon become of less significance, however, in light of changes made by the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172. As a final point, foundations may be deterred from contributing to an organization lacking § 501(c)(3) status because foundations and their managers are subject to tax if the foundation pays any amount "to carry on prop-

aganda, or otherwise to attempt to influence legislation." I.R.C. § 4945(a) and (d)(1).

6. *See, e.g.,* Rev.Ruling 67–293, 1967–2 *Cum. Bull.* 185 (nonprofit organization that operates facility for protection of stray animals does not qualify for exemption if a substantial part of its activities consists of attempts to influence state and local legislation related to welfare of animals); *Kuper v. Commissioner,* 332 F.2d 562, 563 (3d Cir. 1964) (upholding disallowance of deduction for contributions to local chapter of League of Women Voters because of "the general legislative program of the League"); *League of Women Voters v. United States,* 180 F.Supp. 379, 383 (Ct.Cl.1960) (forum discussions by members in formulating position to be taken on questions of public interest held to constitute "preparation for the influencing of legislation" and were therefore legislative activities). "In practice, the *in terrorem* effect of the vague statutory proscription causes many charities to avoid most direct or indirect efforts to support or oppose legislation, even when the legislation is directly related to the charitable purposes for which they are organized and operated." Caplin & Timbie, *Legislative Activities of Public Charities,* 39 L. & Contemp.P. 183, 196 (Autumn 1975). This effect flowed from the inherent ambiguity of the statute. *See Krohn v. United States,* 246 F.Supp. 341, 347–48 (D.Colo.1965) (meaning of "substantial" may vary with different types of organizations, and may turn on extent of the organization's other noncharitable activities as well as the extent of its charitable activities).

Congress sought to ease this problem somewhat in the Tax Reform Act of 1976, Pub.L.No. 94–455, 90 Stat. 1720, which allows certain public charities to be governed by new Code sections 501(h) and 4911. These allow the organization to devote a percentage of its resources to lobbying, and thus provide explicit dollar ceilings on lobbying rather than requir-

are exempt from income taxes even if they engage in substantial lobbying. These organizations are not eligible to receive tax-deductible contributions, however.[7]

In contrast, other Section 501(c) organizations may receive tax-deductible contributions without regard to any lobbying limitation. Contributions to certain cemetery or burial companies, which are exempt under Section 501(c)(13), are deductible under Section 170(c)(5) without explicit statutory limitations concerning lobbying activities.[8] The same is true of contributions to the federal or state governments for exclusively public purposes. See Section 170(c)(1). Labor unions and business leagues are exempt under Sections 501(c)(5) and 501(c)(6) respectively, even if lobbying is their primary purpose. Contributions to such organizations, usually in the form of dues, generally are deductible only to the extent they are "business expenses." [9]

Analysis of where other Section 501(c) organizations fall in this scheme is complicated by the fact that IRS regulations may impose lobbying limitations even when the Code itself is silent. Fraternal beneficiary societies that operate through local lodges

and meet certain other requirements, for example, are exempt under Section 501(c)(8).[10] Although contributions to such societies are tax-deductible only if the contributions are to be used for the group's exempt purposes, the statute imposes no lobbying restriction for gift or income tax purposes, but does for estate tax purposes. Compare I.R.C. § 2055(a)(3) (explicit limitation for estate tax purposes) with I.R.C. § 2522(a)(3) (no restriction for gift tax purposes) and I.R.C. § 170(c)(4) (no restriction for income tax purposes). Treasury Regulations appear to fill this gap, however. The regulations provide that a charitable fund operated by a fraternal beneficiary society will not qualify for tax-deductible contributions under these provisions if the society is an "action organization," which includes organizations that engage in substantial lobbying. Treas. Reg. § 1.501(c)(3)–1(c)(3). See, e.g., id. § 25.-2522(a)–1(a)(4) (gift tax deductions); id. § 1.170A–1(h)(5) (income tax deductions); id. § 2055(a) (estate tax deductions). Despite the impression given by the statute alone, then, fraternal beneficiary societies

---

ing the organization to adhere to the less certain "substantiality" test of Section 501(c)(3). All charities, however, continue to have their lobbying restricted under one standard or the other. "Taxation has not made, and does not plan to make, an election to be covered by the new provisions." Taxation Brief at 27 n.9. The new standard is accordingly not before us and is of little relevance to the discussion below. But see note 40 infra.

7. Section 501(c)(4) applies to:
Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

8. Such companies must be barred by their charters, however, from engaging in any other activities. I.R.C. § 170(c)(5).

9. These sections thus track I.R.C. § 162(e), described in more detail at pp. 731–732 infra. Section 162(e) was enacted by Congress in 1962 to allow businesses to deduct the costs of lobbying directly related to legislation of inter-

est to the taxpayer. If Section 501(c)(5) and (6) organizations use dues for lobbying, the dues are deductible by contributors only to the extent that the requirements of Section 162(e) are satisfied.

10. Section 501(c)(8) and (10) provide for exemption of

(8) Fraternal beneficiary societies, orders, or associations—
(A) operating under the lodge system or for the exclusive benefit of the members of a fraternity itself operating under the lodge system, and
(B) providing for the payment of life, sick, accident, or other benefits to the members of such society, order, or association or their dependents.
. . . .
(10) Domestic fraternal societies, orders, or associations, operating under the lodge system—
(A) The net earnings of which are devoted exclusively to religious, charitable, scientific, literary, educational, and fraternal purposes, and
(B) which do not provide for the payment of life, sick, accident, or other benefits.

resemble Section 501(c)(3) organizations because they are barred by regulation from using tax-deductible contributions to engage in substantial lobbying.

Veterans' organizations, which are exempt under Section 501(c)(19), require even closer analysis than fraternal beneficiary societies. Unlike Section 501(c)(3) organizations, veterans' organizations are not subjected to a lobbying limitation as a prerequisite for receiving tax-deductible contributions. *See, e.g.,* I.R.C. § 170(c)(3) (income tax deductions); I.R.C. § 2055(a)(4) (estate tax deductions); I.R.C. § 2522(a)(4) (gift tax deductions). Again, however, Treasury Regulations condition exemption from income taxes on whether such groups devote themselves "exclusively" to certain veterans' functions. *See* Treas. Reg. § 1.501(c)(19)–1. Moreover, the Treasury Regulations seem to require that veterans' groups obey a lobbying limitation in order to enable their contributors to deduct donations for income tax purposes, *id.* § 170A–1(h)(5), if not for estate or gift tax purposes. In practice, however, veterans' organizations enjoy very different tax treatment. Counsel for the government candidly admitted during oral argument that the regulation governing deductibility of contributions for income tax purposes is not enforced with regard to veterans groups, and the IRS has stated that it will not challenge income tax deductions taken with regard to donations made to these groups. IRS Publication No. 78, Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954 (1980).

### B. *Consequences Suffered by Taxation*

The effect of the statutory scheme, with regulations engrafted, is that different exempt organizations receive disparate tax treatment, depending on their lobbying activities. Section 501(c) runs the gamut from organizations that may lobby but receive no tax-deductible contributions, *e.g.,* Section 501(c)(4); organizations that may receive tax-deductible contributions but may not lobby, *e.g.,* Section 501(c)(3); and organizations that in practice may do both, *i.e.,* veterans' organizations under Section 501(c)(19). An organization such as Taxation may not receive tax-deductible contributions if it engages in "substantial" lobbying, but a qualifying veterans' organization may continue to receive tax-deductible contributions even if it lobbies as much and on as many issues as it chooses.

Perhaps as a result of this uneven treatment, veterans' groups such as the American Legion and the Veterans of Foreign Wars are active before Congress on a large number of different issues. The American Legion and its affiliates "have historically been among the most active lobbying organizations on the national scene." Troyer, *Charities, Law-Making, and the Constitution: The Validity of the Restrictions on Influencing Legislation,* 31 N.Y.U. Inst. on Fed. Tax. 1415, 1439 (1973). Veterans' organizations have sought to influence legislation involving ratification of the Panama Canal treaties, Alaska national parks, national security issues, and elimination of Saturday mail delivery.[11] But a § 501(c)(3)

---

11. *See, e.g., Inclusion of Alaska Lands: Hearings Before the Subcommittee on General Oversight and Alaska Lands of the House Committee on Interior and Insular Affairs,* 95th Cong., 1st Sess. 100 (1977) (statement of Delmar L. Shull, VFW); *Six-Day Mail Delivery: Hearings Before the House Committee on the Post Office and Civil Service,* 95th Cong., 1st & 2d Sess. 197 (1977–1978) (statement of Spike Brooker, Commander, Post 58, American Legion); *id.* at 216 (statement of Robert Copenbarger, VFW Post of El Paso); *Postal Service Act of 1977: Joint Hearings Before the Subcommittee on Postal Operations and Services and Subcommittee on Postal Personnel and Modernization of the House Committee on the*

*Post Office and Civil Service,* 95th Cong., 1st Sess. 103 (1977) (statement of James F. O'Neil, publisher, American Legion magazine); *id.* at 106 (statement of Donald H. Schwab, director national legislative service, VFW); *Department of Defense Appropriations for 1977: Hearings Before a Subcommittee of the House Committee on Appropriations,* 95th Cong., 2d Sess., pt. 8, 685–710 (1978) (National Security Resolution adopted by the 59th National Convention of the American Legion supporting, inter alia, development of the B–1 bomber, M–X missile, cruise missiles, and reestablishment of selective service system). Veterans' organizations have even lobbied on matters that presumably have special interest to organizations such as Taxa-

charitable organization, such as one formed to promote health care, may not engage in substantial lobbying even when the legislation relates directly to its exempt purpose, say a bill for the construction of more hospitals.

 Two preliminary arguments, which could be said to concern standing, should be addressed before turning to the central issues of this case. First, the government notes that because a charitable organization may be exempt from payment of income taxes under Section 501(c)(4) even if it engages in substantial lobbying, Section 501(c)(3) in no way constitutes a direct governmental interference with Taxation's lobbying. Supplemental Brief for Appellee United States (IRS Supp. Brief) at 14. The implication is that Taxation has suffered no injury from denial of Section 501(c)(3) status because the provisions of the Code "neither restrict Taxation's lobbying activities nor deny Taxation tax exempt status because of its planned activities." *Id.* As the description of the statutory scheme shows, however, disparate tax benefits depend on the specific statutory provision under which an organization is determined to be exempt from federal income tax. Taxation's lack of Section 501(c)(3) status causes it substan-

tial disadvantages, notably exclusion from the IRS "Cumulative List" of organizations entitled to receive tax-deductible donations and foundation grants.[12] "[A]ppearance on the Cumulative List is a prerequisite to successful fund raising for most charitable organizations. Many contributors simply will not make donations to an organization that does not appear on the Cumulative List." *Bob Jones University v. Simon*, 416 U.S. 725, 729–30, 94 S.Ct. 2038, 2042–43, 40 L.Ed.2d 496 (1974). It is therefore irrelevant to Taxation's case that it might lobby substantially and still be exempt from payment of income taxes under Section 501(c)(4).[13]

A second preliminary argument suggested by the government is related to the first. Because the chief effect of Taxation's refusal to comply with the "no substantial lobbying" clause of Section 501(c)(3) is that its contributors may not make tax deductible contributions, the government implies that Taxation is not the proper party to bring this case. IRS Supp. Brief at 19. "The attenuated effect on Taxation of denying a deduction to its potential contributors" is said not to constitute a "significant encroachment" or "serious infringement" of Taxation's right to lobby, *id.*, and "does not

tion. *E.g., Tax Simplification Proposals: Field Hearings Before the Subcommittee on Oversight of the House Committee on Ways and Means*, 95th Cong., 1st & 2d Sess. 234 (1977–1978) (statement of James Lund, VFW).

**12.** IRS Publication No. 78, Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954 (1980) (periodically updated). "The listing of an organization in [the Cumulative List] signifies it has received a ruling or determination letter . . . stating that contributions by donors to the organization are deductible as provided in section 170 of the Code." Rev.Proc. 72–39, 1972–2 *Cum.Bull.* 818. "The Service has announced that, with narrowly limited exceptions, a donor may rely on the Cumulative List for so long as the beneficiaries of his largesse maintain their listing, regardless of their actual tax status." *Bob Jones University v. Simon*, 416 U.S. 725, 729, 94 S.Ct. 2038, 2042, 40 L.Ed.2d 496 (1974). An organization's loss of this status, and "the crucial right to receive deductible contributions," is "tantamount to a death sentence." Caplin & Timbie, *supra* note 6, at 195. "From the practical point of view, charities are not

very much concerned about their own taxes. . . . It is, however, vital that they qualify as exempt charities in order that donors may deduct contributions made to them." Clark, *The Limitation on Political Activities: A Discordant Note in the Law of Charities*, 46 Va.L.Rev. 439, 445–46 (1960).

**13.** It is far from clear, however, that Taxation could seek tax-exempt status as a social welfare organization after denial of Section 501(c)(3) status. In 1976, Congress provided that a Section 501(c)(3) organization that forfeits its exemption by lobbying may not then qualify as a social welfare organization under Section 501(c)(4). See I.R.C. § 504. Congress enacted that provision to prevent a Section 501(c)(3) organization from "build[ing] up an endowment out of deductible contributions as a charitable organization and then us[ing] that tax-favored fund to support substantial amounts of lobbying as a section 501(c)(4) social welfare organization." S.Rep.No.938, pt. 2, 94th Cong., 2d Sess. 83, *reprinted in* [1976] U.S.Code Cong. & Ad.News 4030, 4107–08.

infringe Taxation's First Amendment rights," *id.* at 26. This argument too may be easily dismissed. Taxation has standing to raise First Amendment claims on behalf of its members and supporters,[14] and it is clearly evident that Taxation will be harmed if its contributors cease giving it money. Regardless of the merits of its case, Taxation undoubtedly is an appropriate party to bring this action.

In short, Taxation has complained that Section 501(c) exposes the lobbying of various tax-exempt groups to discriminatory tax treatment and thereby violates Taxation's First Amendment and equal protection rights. The statutory provision effectively limits the ability of charitable organizations to present to legislators their views on legislation even when the legislation directly affects their charitable objects. There is a difference, of course, between showing that a statute has a discriminatory application and that it is unconstitutional. But Taxation has met the threshold requirement of demonstrating injury from the unequal application of a statute,[15] and it is to the constitutionality of that statute we now turn.

## II. THE APPROPRIATE STANDARD OF REVIEW

■ The starting point for our review must be determination of the appropriate standard to apply in reviewing appellant's constitutional claims. *See Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65

---

**14.** *See, e.g., NAACP v. Alabama,* 357 U.S. 449, 458, 78 S.Ct. 1163, 1169, 2 L.Ed.2d 1488 (1958) (an organization may assert, on behalf of its members, certain of their First Amendment rights); *Bates v. Little Rock,* 361 U.S. 516, 523 n.9, 80 S.Ct. 412, 416 n.9, 4 L.Ed.2d 480 (1960). In *Buckley v. Valeo,* 424 U.S. 1, 12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976), the Court held that appellants had standing to challenge a limitation of $1,000 on individual contributions. The limitation "precludes most associations from effectively amplifying the voice of their adherents" and "is simultaneously an interference with the freedom of [their] adherents." *Id.* at 22, 96 S.Ct. at 636 (quoting *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957) (plurality opinion)).

**15.** The government also makes the astounding argument that "discrimination" is not shown simply because of "disparities in the treatment accorded somewhat similarly situated taxpayers—particularly organizations exempt from tax under different provisions of the Code," and that "the federal tax laws pertaining to the lobbying activities of tax exempt organizations are no less 'neutral' now" than they were in 1959, before Congress enacted Section 162(e). IRS Supp. Brief at 24. The Supreme Court has soundly repudiated the contention that the demands of equal protection are met when the law applies equally to all within the statutory class:

> application among the members of the class defined by Judicial inquiry . . . does not end with a showing of equal the legislation. The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose. . . .

*McLaughlin v. Florida,* 379 U.S. 184, 191, 85 S.Ct. 283, 287, 13 L.Ed.2d 222 (1964). *See Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942); *Rinaldi v. Yeager,* 384 U.S. 305, 308–09, 86 S.Ct. 1497, 1499–1500, 16 L.Ed.2d 577 (1966).

The dissent suggests that Congress has limited the lobbying and political activities of the nation's more prominent veterans' groups by incorporating them with federal charters that "uniformly contain provisions barring them from engaging in partisan political activity . . . ." Dissent at 760–761. This raises several questions of fact not addressed by the district court, including which of the nation's 22,000 veterans' organizations have such charters and whether these charters are actually enforced. The Veterans of Foreign Wars, for example, does not seem to have charter limitations on its political activities. *See* 36 U.S.C. § 111 *et seq.* (1976). Indeed, the VFW endorsed a presidential candidate in the 1980 election. *See* "The Republicans in Detroit; Veterans' Group Endorses Reagan," Washington Post, July 17, 1980, at A11. Moreover, the fact that some veterans' organizations are federally chartered does not distinguish them from section 501(c)(3) organizations, which may also have federal charters. *See, e.g.,* 36 U.S.C. § 1 (1976) (American National Red Cross); *id.* § 21 (Boy Scouts of America); *id.* § 271 (Future Farmers of America); *id.* § 371 (United States Olympic Committee); *id.* § 461 (National Safety Council); *id.* § 881 (Big Brothers of America). Indeed, the juxtaposition of veterans' organizations and section 501(c)(3) organizations throughout this title illustrates the essential similarity of these "private corporations established under Federal law." *Id.* § 1101.

L.Ed.2d 784 (1980). We find that a high level of scrutiny is required because the lobbying restriction of Section 501(c)(3) constitutes a limitation on protected First Amendment activity, and because Taxation's equal protection argument therefore involves what is clearly a fundamental right.[16] In analyzing the differential treatment challenged here, the question then must be whether a substantial governmental interest supports the classification and whether the classification is narrowly drawn to serve that interest.

## A. First Amendment Implications

 There is no question whatsoever that lobbying comes within the protection of the First Amendment. See, e.g., California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972); New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137–38, 81 S.Ct. 523, 529–30, 5 L.Ed.2d 464 (1961). It is also beyond dispute that First Amendment freedoms are fundamental rights in our society. See, e.g., Schad v. Borough of Mount Ephraim, 452 U.S. 61, 67, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981); Central Hudson Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557, 565, 100 S.Ct.

2343, 2350, 65 L.Ed.2d 341 (1980). Were this a case in which the government sought to suppress the lobbying activities of Taxation directly, the appropriate level of scrutiny would be obvious. See, e.g., N.A.A.C.P. v. Button, 371 U.S. 415, 438–39, 83 S.Ct. 328, 340–41, 9 L.Ed.2d 405 (1963); Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960).

 First Amendment rights are not abridged, however, merely because the government refuses to subsidize those rights. In Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), the Supreme Court upheld Treasury regulations that prohibited business deductions of lobbying expenses on the ground that governmental refusal to underwrite lobbying costs does not violate the First Amendment. See Harris v. McRae, 448 U.S. at 318, 100 S.Ct. at 2689 (whether Congress should subsidize the exercise of a fundamental constitutional freedom is "not a matter of constitutional entitlement").[17] For the same reasons, in "Americans United" Inc. v. Walters, 477 F.2d 1169, 1182 (D.C. Cir. 1973), rev'd on other grounds sub nom. Alexander v. "Americans United" Inc., 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974), this court followed Cammarano in dismissing the appellants' claim that Section 501(c)(3)'s lobbying restriction violated the First Amendment on its face.[18]

---

16. Because the challenged classification is created by federal statutes, the equal protection guarantees of the Fifth Amendment rather than the Fourteenth Amendment apply. See, e.g., Buckley v. Valeo, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976); Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 1228 n.2, 43 L.Ed.2d 514 (1975); Johnson v. Robison, 415 U.S. 361, 364 n.4, 94 S.Ct. 1160, 1164 n.4, 39 L.Ed.2d 389 (1974); Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

17. This statement was made in the context of only the first of several constitutional arguments rejected in McRae, that congressional restriction of the availability of certain medically necessary abortions under Medicaid impinged on the liberty interests protected by the Due Process clause as recognized in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its progeny. See 448 U.S. at 312, 100 S.Ct. at 2686. The Court elaborated

the theme later in the opinion: "It cannot be that because government may not prohibit the use of contraceptives . . . or prevent parents from sending their child to a private school . . . , government, therefore, has an affirmative constitutional obligation to ensure that all persons have the financial resources to obtain contraceptives or send their children to private schools." Id. 448 U.S. at 318, 100 S.Ct. at 2689.

18. In reversing, the Supreme Court held simply that Americans United's request for injunctive relief requiring reinstatement of its tax-exempt status was barred by the Anti-Injunction Act's prohibition against suits "for the purpose of restraining the assessment or collection of any tax." 416 U.S. at 757, 94 S.Ct. at 2056 (quoting I.R.C. § 7421(a)). The Court did not discuss the merits of appellants' case, other than noting that "[t]he consequences of the present regime for § 501(c)(3) organizations can be harsh indeed. . . ." Id. at 763 n.14, 94 S.Ct. at

██ Taxation makes a valiant attempt to avoid these holdings by claiming that the lobbying restriction of Section 501(c)(3) constitutes an "unconstitutional condition" on the exercise of its First Amendment rights. In *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), the Supreme Court explained that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons," the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Accord, McDaniel v. Paty*, 435 U.S. 618, 626, 98 S.Ct. 1322, 1327, 55 L.Ed.2d 593 (1978); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Shelton v. Tucker*, 364 U.S. 479, 485–86, 81 S.Ct. 247, 250–51, 5 L.Ed.2d 231 (1960); *Tygrett v. Barry*, 627 F.2d 1279 (D.C. Cir. 1980). *Cf. Speiser v. Randall*, 357 U.S. 513, 518, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958) ("conditions imposed upon the granting of privileges or gratuities must be 'reasonable' "). The Supreme Court's decisions "have prohibited conditions on public benefits ... which dampen the exercise generally of First Amendment rights, however slight the inducement to the individual to forsake those rights." *Elrod v. Burns*, 427 U.S. 347, 358 n.11, 96 S.Ct. 2673, 2682 n.11, 49 L.Ed.2d 547 (1976) (plurality opinion). Taxation could enjoy the "public ben-

efits" of Section 501(c)(3), provided it did not exceed a "substantial" level of lobbying. Because Section 501(c)(3) expressly conditions receipt of these benefits on a charity's willingness to refrain from a greater level of expression, Taxation contends, an unconstitutional condition has been placed on the furnishing of these tax benefits. "The Government has no obligation whatever to grant tax advantages to charities, but if it decides to do so, it cannot condition receipt of the advantages on a surrender of First Amendment rights." Brief for Appellant Taxation (Taxation Brief) at 21.

This argument has some strength, but we reject its premise. It is true that under certain conditions, the indirect aid granted through tax exemptions and deductions is the functional equivalent of a direct government payment.[19] *See Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 790–91, 93 S.Ct. 2955, 2974–75, 37 L.Ed.2d 948 (1973) (declaring a tax benefit system invalid under the Establishment Clause); *Green v. Connally*, 330 F.Supp. 1150, 1156–57 (D.D.C.), *aff'd mem. sub nom. Coit v. Green*, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) (§ 501(c)(3) may not be used to benefit racially discriminatory private schools). "To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech." *Speiser v. Randall*, 357 U.S. at 518, 78 S.Ct. at 1338. Taxation's argu-

---

2059 n.14. *See id.* at 782, 94 S.Ct. at 2068 (Blackmun, J., dissenting) (implying no opinion on merits of underlying controversy, but agreeing with court of appeals that case presented a substantial constitutional question).

**19.** *See, e.g.*, Surrey & McDaniel, *The Tax Expenditure Concept and the Budget Reform Act of 1974*, 17 B.C.Indust. & Comm.L.Rev. 679 (1979); *cf.* Dodyk, *The Tax Reform Act of 1969 and the Poor*, 71 Colum.L.Rev. 758 (1971). The government accepts the analogy between tax exemptions and direct governmental subsidies for purposes of this case, while cautioning that they have different characteristics. IRS Supp. Brief at 11 n.12. *See, e.g., Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), which held that a property tax exemption for religious organizations does not

violate the Establishment Clause of the First Amendment, there being no "genuine nexus between tax exemption and establishment of religion." In *Marker v. Shultz*, 485 F.2d 1003 (D.C.Cir.1973), this court held that tax exemptions for unions under Section 501(c)(5) did not constitute state involvement and prohibited support for union political activities. "A tax exemption is consistent with a 'benevolent neutrality' and government noninvolvement with the exempted organization." *Id.* at 1006. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972) (state provision of necessary services such as police and fire protection, given to everyone without connotation of approval, does not constitute fostering or encouragement of racial discrimination).

ment would therefore be troublesome if it were the case that the government conditioned its provision of tax benefits on a charitable organization's waiver of First Amendment rights.[20]

It is overly mechanistic, however, to suggest that the Section 501(c)(3) lobbying restriction actually is a condition on the receipt of tax benefits by charities. A group such as Taxation can easily structure itself along dual lines, under both Sections 501(c)(3) and 501(c)(4) of the Code, using the latter organization only for lobbying purposes.[21] Because Section 501(c)(4) organizations may lobby freely without losing the tax benefits for which they qualify, the use of both subsections accords a charitable organization full tax benefits *other than* the ability to lobby with tax-deductible contributions—and this distinction is entirely permissible under *Cammarano*. Charitable organizations are simply not required to waive their First Amendment rights in order to obtain public benefits—they simply may not lobby with tax-deductible contributions—and Taxation's "unconstitutional condition" argument must therefore fail.

As we observed at the outset, then, Taxation has no compelling claim based solely on the First Amendment.[22] We reject "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Cammarano v. United States*, 358 U.S. at 515, 79 S.Ct. at 534 (Douglas, J., concurring). We also reject Taxation's "unconstitutional condition" argument, because charitable organizations are governed by no conditions other than those upheld in *Cammarano*. Taxation has not shown that Section 501(c)(3)'s lobbying restriction abridges its First Amendment rights.

### B. *Equal Protection Implications*

Our discussion of Taxation's First Amendment claims does not resolve the appropriate standard of review, because this is not a situation in which the government refuses impartially to subsidize *all* lobbying activities. Although the government need not subsidize the exercise of First Amendment rights, the question remains the appropriate standard of review when government subsidizes the exercise of First Amendment rights in a discriminatory fashion.[23]

---

**20.** If this were the case, we would be forced to decide whether the restrictions on charities that received benefits under Section 501(c)(3) were both important and necessary to assure that the objects of the benefit program were attained. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 57 n.65, 96 S.Ct. 612, 653 n.65, 46 L.Ed.2d 659 (1976) (Congress may condition candidates' receipt of federal financing on agreement to abide by limitations on overall campaign expenditures); *Civil Service Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding restriction of political activity by federal employees). Taxation makes a strong argument that lobbying activities are not inconsistent with charitable purposes, *see, e.g.*, 2 Restatement (Second) of Trusts § 374 (1959); IV R. W. Scott, The Law of Trusts § 374 (3d ed. 1967), but our disposition of Taxation's First Amendment claim makes it unnecessary to consider this argument.

**21.** As noted above, *see* note 1 *supra*, Taxation in fact originally followed this dual organizational structure. Although a Section 501(c)(3) organization may be barred from converting to a Section 501(c)(4) organization, *see* note 13 *supra*, nothing keeps such an organization from forming a *new* arm at any time and using

non-deductible contributions made to it for lobbying purposes.

**22.** Taxation does not challenge the proscription against "substantial lobbying" on grounds of vagueness, however, and that question is not considered in this opinion. *See* Borod, *Lobbying for the Public Interest*, 42 N.Y.U.L.Rev. 1087, 1106–10 (1967); Clark, *supra* note 12, at 451–54; Troyer, *Charities, Law-Making, and the Constitution: The Validity of Restrictions on Influencing Legislation*, 31 N.Y.U.Inst. on Fed.Tax. 1415, 1456–62 (1973).

**23.** It may be misleading to treat First Amendment and equal protection questions as though they were entirely separate, however. In cases such as this, there is a distinct interplay between these two constitutional principles. *See* Emerson, *The Affirmative Side of the First Amendment*, 15 Ga.L.Rev. 795, 802–03, 819 (1981) (discussing "an equal protection element in the first amendment guarantee" in the context of governmental subsidies for speech). "The peculiar identity of equal protection and first amendment analyses in differential access cases follows logically from the explicit constitutional designation of speech as fundamental and from the fact that the first amendment's

In *Speiser v. Randall*, 357 U.S. 513, 518, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958), the Supreme Court held that discriminatory denial of tax exemptions for engaging in speech can impermissibly infringe First Amendment rights. *Speiser* concerned a California statute that conditioned property tax exemptions on the taking of a loyalty oath. The Court held that even though the statute involved merely the discriminatory denial of tax *exemptions*, and not the direct suppression of speech, a strict level of scrutiny was appropriate. "When we deal with the complex of strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in the light of the particular circumstances to which it is applied." *Id.* at 520, 78 S.Ct. at 1338. After conducting this close analysis, the Court concluded that California "clearly has no such compelling interest at stake" as would justify the operation of the statute. *Id.* at 529, 78 S.Ct. at 1343.[24]

Although *Speiser* was decided a year earlier than *Cammarano*, nothing in the later case repudiates this ruling. Indeed, Justice Harlan's opinion for the Court in *Cammarano* carefully distinguished the earlier decision:

*Speiser* has no relevance to the cases before us. Petitioners are not being denied a tax deduction because they engage in constitutionally protected activities, but are simply being required to pay for those activities entirely out of their own pockets, *as everyone else engaging in similar activities is required to do* under the provisions of the Internal Revenue Code. *Nondiscriminatory* denial of deduction from gross income to sums expended to promote or defeat legislation is plainly not " 'aimed at the suppression of dangerous ideas.' " 357 U.S., at 519 [78 S.Ct., at 1338]. Rather, it appears to us to express a determination by Congress that since purchased publicity can influence the fate of legislation which will affect, directly or indirectly, all in the community, *everyone in the community should stand on the same footing* as regards its purchase so far as the Treasury of the United States is concerned.

358 U.S. at 513, 79 S.Ct. at 533 (emphasis added). The Court's emphasis on "nondiscriminatory" denial of benefits clearly dis-

---

proscription against censorship is itself simply a specialized equal protection guarantee." *Perry Local Educators' Ass'n v. Hohlt*, 652 F.2d 1286, 1296 (7th Cir. 1981). *See Karst, Equality as a Central Principle in the First Amendment*, 43 U.Chi.L.Rev. 20 (1975). The Supreme Court has recognized this interplay many times. *See, e.g., Carey v. Brown*, 447 U.S. 455, 460–61, 466–71, 100 S.Ct. 2286, 2290–91, 2293–96, 65 L.Ed.2d 263 (1980); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 510–11, 89 S.Ct. 733, 738–39, 21 L.Ed.2d 731 (1969) (although classrooms are not public forums, rule prohibiting students from wearing armbands in protest of the Vietnam War struck down in part because school did not prohibit wearing of other symbols of political significance).

**24.** Although it could be suggested that *Speiser* should be understood as striking down a statute "frankly aimed at the suppression of dangerous ideas," 357 U.S. at 519, 78 S.Ct. at 1338, and therefore inapposite here, that interpretation conflicts with the approach taken by the Court. *Speiser* was decided in 1958, soon after the decision in *Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). The California statute was an attempt to en-

force Article XX, § 19, of the California Constitution, which denied tax exemptions to any "person or organization which advocates the overthrow of the Government of the United States or the State by force or violence," *see* 357 U.S. at 516, 78 S.Ct. at 1336. The Court explicitly refused to reach the question of whether "California may deny tax exemptions to persons who engage in the proscribed speech for which they might be fined or imprisoned." *Id.* at 520, 78 S.Ct. at 1338. Instead, the Court applied strict scrutiny to the "procedural safeguards" and "burden of proof" established by the statute, *id.* at 521, 78 S.Ct. at 1339, and found that "this allocation of the burden of proof, on an issue concerning freedom of speech, falls short of the requirements of due process." *Id.* at 523, 78 S.Ct. at 1340. Although it may be correct that an underlying hostility to the California sedition law actually explains *Speiser, see Pennsylvania v. Nelson*, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956), the Court itself was careful to decide the case in light of the strict scrutiny that must be applied to discriminatory tax treatment that implicates *any* First Amendment rights.

tinguishes *Cammarano* from this case. *Cammarano* and *Speiser* are therefore consistent in requiring a strict standard of review for situations in which the government grants tax exemptions affecting First Amendment rights on a discriminatory basis.

This court's previous decisions explicitly adopt this reading of the relationship between *Speiser* and *Cammarano*. In *"Americans United" Inc. v. Walters*, 477 F.2d 1169, we held that the appellants' claim that Section 501(c)(3)'s lobbying restriction was unconstitutionally discriminatory raised a substantial constitutional question:

> *Cammarano*, while disposing of appellants' claim that first amendment rights are violated by the questioned statute, does not attempt to deal with possible discriminatory conduct. . . . Americans United, on the other hand, alleges just that discriminatory conduct found lacking in *Cammarano*. . . .
>
> If discrimination exists here it relates to the exercise of the most fundamental of rights, those protected by the first amendment. . . . This is neither a frivolous challenge nor one which, as of the writing of this opinion, has been foreclosed by the Supreme Court.

*Id.* at 1182–83.[25] *See Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1034 & n.7 (D.C. Cir. 1980); *Haswell v. United States*, 500 F.2d 1133, 1147–48 (Ct.Cl.1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 779, 42 L.Ed.2d 803 (1975). Similarly, in *Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102 (D.C. Cir. 1978) (en banc), this court invalidated a requirement that noncommercial educational stations record and maintain copies of broadcasts on issues of public importance because

where noncontent-based distinctions are drawn in a statute affecting First Amendment rights, the Supreme Court has held that the government interest served must be "substantial" and the statutory classification "narrowly tailored" to serve that interest if the statute is to withstand equal protection scrutiny. *Id.* at 1122; *see id.* at 1111.

The case before us arguably differs from *Community Service* and even *Speiser* in the sense that it involves unequal levels of governmental subsidy of First Amendment rights, rather than a more intrusive governmental restriction of those rights. The question apparently remains open whether courts may adopt a different level of scrutiny in cases of this sort, one that is somewhat less searching than the scrutiny applied when the government directly bans First Amendment expression. *See Perry Local Educators' Ass'n v. Hohlt*, 652 F.2d 1286, 1296–97 (7th Cir. 1981) (suggesting existence of sliding scale that "may vary with the particular right in question"). It is not necessary to decide whether, in view of the nature of the inhibition of Taxation's First Amendment rights, the appropriate level of review is the most stringent courts employ. It is certainly inadequate simply to ask whether the classifications at issue in this case "bear some rational relationship to a legitimate state end." *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). Plainly, this case is not like *Cammarano*, in which the indirect burdens on First Amendment expression fell equally on all. Only a heightened scrutiny test fully accords with decisions in other cases.[26] In-

---

**25.** It should be noted, however, that appellant in *"Americans United"* dropped its First Amendment claims on appeal. *See* 477 F.2d at 1181 ("at oral argument and in its Reply Brief it has narrowed its focus, and we believe wisely so, to the 'discriminatory' aspects of § 501(c)(3)").

**26.** Judge Wisdom's comments in *Perry Local Educators' Ass'n v. Hohlt*, 652 F.2d 1286 (7th Cir. 1981), which concerned an analogous equal-access claim by a union to use a school

board's internal mail system already being used by another union, are instructive:

> Despite the sweeping language of [*Police Department v.*] *Mosley* [408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212] quoted above, other Supreme Court cases demonstrate that it is not invariably true that the government may never discriminate among constitutionally protected speech on the basis of its content or on the basis of the speaker, nor even that all such discrimination must always be scrutinized with equal strictness. Because a ma-

deed, our analysis must be guided by *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), in which the Supreme Court heard challenges to public financing provisions for presidential campaigns that provided far greater financial support to major-party candidates. In determining the standard of review appropriate under the Fifth Amendment, the Court started from precedents holding that direct "restrictions on access to the electoral process must survive exacting scrutiny." *Id.* at 94, 96 S.Ct. at 670. *See, e.g., Lubin v. Panish*, 415 U.S. 709, 718, 94 S.Ct. 1315, 1321, 39 L.Ed.2d 702 (1974) (indigent candidates may not be required to pay filing fees absent alternative means of ballot access); *Williams v. Rhodes*, 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968) (appearance of minor parties on ballot may not be conditioned on whether they can obtain voter petitions with signatures totaling 15 percent of the number of ballots cast in the previous gubernatorial election). These "direct burdens" were much more restrictive than discriminatory funding of presidential candidates, the Court said, thereby implying that less than "exacting scrutiny" was appropriate. *Id.* But it is highly significant that the Court went on to analyze the discriminatory funding provisions in heightened scrutiny terms. "In any event, Congress enacted Subtitle H in furtherance of sufficiently important governmental interests," *id.*, 424 U.S. at 95, 96 S.Ct. at 671, because "public financing as a means of eliminating the improper influence of large private contributions furthers *a significant governmental interest.*" *Id.* at 96, 96 S.Ct. at 671 (emphasis added). The standard of review we select in this case must be no lower than that applied in *Buckley*, even though neither situation involves a "direct burden" on First Amendment expression.[27] *Cf. Citi-*

jority of the Court were unable to agree on any one rationale in some of these cases, it is not always easy to determine the appropriate standard of review. Even interpreting the cases in the way most favorable to the defendants, however, they require rigorous scrutiny to be applied here.... [S]peech restrictions keyed to the identity of the speaker are always scrutinized strictly: they almost invariably are not neutral with respect to the viewpoints they tend to disfavor. *Id.* at 1294–95. *National Black United Fund, Inc. v. Devine*, 667 F.2d 173 (D.C.Cir., 1981), which rejected a claim that refusal to allow participation in the Combined Federal Campaign by a nonqualifying charity abridged appellant's First Amendment rights, is not to the contrary. The opinion observed that the mere "possibility" that the voices of some charities might be amplified at the expense of others did not "compel strict scrutiny of every Commission decision," at 179, because the regulations at issue were "intended to serve interests unrelated to the suppression of speech" and were thus subject to evaluation under a different standard. *Id.* at 179. By contrast, the Section 501(c) lobbying restriction clearly was intended to regulate speech. "A rule that substantially impairs the ability of certain groups to convey their message to a desired audience, on the other hand, effectively 'abridges speech' even if it is not intended to curtail public debate.... Government must bear a far heavier burden of justification for such a rule. Its content-neutral interests must be 'compelling' and it must demonstrate the absence of any 'less drastic means' for achieving its purpose." *Id.* In the case now before us, even the government acknowledges that "[t]he democratic process as a whole is jeopardized where the government provides undue support to any one lobbying faction, including the class of charitable organizations." IRS Brief at 29.

27. *Buckley* is directly analogous to this case because Congress had approved greater public funding of First Amendment activities for some candidates as opposed to others. *Buckley* is also distinguishable, however, in the sense that it involved less restrictive discriminations than those at issue here. The Court noted that correlative restrictions on major-party candidates helped offset the lack of full financing given to minor parties: "But since any major-party candidate accepting public financing of a campaign voluntarily assents to a spending ceiling, other candidates will be able to spend more in relation to the major-party candidates." 424 U.S. at 99, 96 S.Ct. at 673. No such offsetting advantages in Section 501 for charitable groups have been suggested here. The Court also observed in *Buckley* that the "risk of harm to minority interests is speculative" because the statute had yet to go into force, *id.* at 101, 96 S.Ct. at 674, and cautioned that "we of course do not rule out the possibility of concluding in some future case, upon an appropriate factual demonstration, that the public financing system invidiously discriminates against nonmajor parties." *Id.* 424 U.S. at 97 n.131, 96 S.Ct. at 672 n.131. Again, in contrast, the Section 501(c)(3) restriction on lobbying by charitable organizations has been in effect since 1934.

zens *Against Rent Control/Coalition for Fair Housing v. Berkeley*, —— U.S. ——, ——, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981) ("regulation of First Amendment rights is always subject to exacting judicial review.").

In short, we must apply a heightened level of scrutiny to the *discriminatory* treat-

ment of lobbying activities given by Section 501(c) to different tax-exempt groups. It may be true that "in taxation, even more than in other fields, legislatures possess the greatest freedom in classification," *Madden v. Kentucky*, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940), but that power is not unlimited.[28] As the Supreme Court

---

28. The government argues that no Supreme Court cases have ever held that classifications in federal tax statutes are to be measured by more than a rational basis standard, IRS Supp. Brief at 30, and that it knows of no Supreme Court cases holding a federal tax statute invalid on equal protection grounds, *id.* at 31. *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 41, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973) (quoting *Madden v. Kentucky*); *Lenhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 360, 93 S.Ct. 1001, 1004, 35 L.Ed.2d 351 (1973) (tax statute must be "palpably arbitrary" or "invidious" to violate equal protection guarantees). These cases do not involve First Amendment claims, however, which must be measured under a more searching standard. *Speiser v. Randall*, 357 U.S. at 518, 78 S.Ct. at 1338.

Federal tax statutes have been overturned, however—by the Supreme Court as well as lower federal courts. *E.g., National Life Ins. Co. v. United States*, 277 U.S. 508, 520, 48 S.Ct. 591, 593, 72 L.Ed. 968 (1928) ("The suggestion that as Congress may or may not grant deductions from gross income at pleasure, it can deny to one and give to another is specious, but unsound"); *id.* at 534, 48 S.Ct. at 598 (Brandeis, J., dissenting) ("The Court has, of course, power to declare that the system of taxation established by Congress is unconstitutional"); *Moritz v. Commissioner*, 469 F.2d 466 (10th Cir. 1972), *cert. denied*, 412 U.S. 906, 93 S.Ct. 2291, 36 L.Ed.2d 971 (1973) (dependent care deduction provision of Code impermissibly distinguished between unmarried male and unmarried female taxpayers); *cf. Golden Rule Church Ass'n*, 41 T.C. 719, 729 (1964) ("Although tax benefits may be matters of legislative grace ... nevertheless, a denial of such benefits granted to others of essentially the same class may well rise to the level of an unconstitutional discrimination"). Moreover, state tax classifications have been struck down for incompatibility with equal protection principles. *E.g., Iowa-Des Moines National Bank v. Bennett*, 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265 (1931); *cf. In re Estate of Legatos*, 1 Cal. App.3d 657, 81 Cal.Rptr. 910 (1969) (equal protection proscribes arbitrary tax classifications). In addition, despite popular conceptions, Social Security is more akin to a tax than an insurance payment. *See Califano v. Goldfarb*, 430 U.S. 199, 217–18, 97 S.Ct. 1021, 1032–33, 51 L.Ed.2d 192 (1977) (Stevens, J., concurring in judgment). The Supreme Court, applying an elevated but not its most stringent standard of review, has found certain gender-based classifications in the Social Security Act unconstitutional. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Califano v. Goldfarb, supra. See generally* Van Alstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law*, 81 Harv.L.Rev. 1439, 1461 (1968) ("A minimum demand of uniformly reasonable rules in the management of public largesse is surely an unexceptional requirement of constitutional government").

The government suggests that *Moritz* is a case "of questionable vitality" in light of *Kahn v. Shevin*, 416 U.S. 351, 355, 94 S.Ct. 1734, 1737, 40 L.Ed.2d 189 (1974), in which the Supreme Court held that Florida could provide a property tax exemption for widows but not for widowers without violating equal protection guarantees. IRS Supp. Brief at 31 n.25. The two cases are clearly distinguishable, however, and even in *Kahn* the statute was upheld after a level of review showing that the differential treatment had "a fair and substantial relation to the object of the legislation." *Id.* at 355, 94 S.Ct. at 1737 (*quoting Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971))

It is true that almost three decades ago, this court applied a rational basis test in upholding provisions of the Subversive Activities Control Act that denied tax exemptions or deductibility of contributions to any communist-action organization, regardless of its status under I.R.C. §§ 170 and 501.

The sanctions with reference to tax exemptions and deductions, which are in Section 11 of the Act, forbid income tax deductions for contributions to a registered organization and deny income tax exemptions to such organizations. These allowances and denials fall within the field of congressional grace so long as a reasonable basis appears. This is too well established to require citation. We think these provisions clearly valid.

*Communist Party of the United States v. Subversive Activities Control Board*, 223 F.2d 531, 557 (D.C.Cir.1954), *rev'd on other grounds*, 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003 (1956). But this case is of doubtful authority in view of *Speiser v. Randall*, which was decided four years later. *Compare Seasongood v. Commissioner*, 227 F.2d 907, 911 (6th Cir. 1955) (construing "propaganda" to reach only coloring or distortion of facts with an ulterior motive, and

held in *Police Dep't v. Mosley*, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972), there is a profound constitutional distinction between regulating all picketing and doing so selectively. "Because picketing plainly involves expressive conduct within the protection of the First Amendment, . . . discriminations among pickets must be tailored to serve a substantial governmental interest." *See Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263 (1980) (reaffirming *Mosley*); *California v. LaRue*, 409 U.S. 109, 138, 93 S.Ct. 390, 407, 34 L.Ed.2d 342 (1972) (Marshall, J., dissenting). The issue in this case therefore becomes whether the discriminatory framework of Section 501(c) serves a substantial governmental interest and whether the statute is narrowly tailored to serve that end.

## III. CONSTITUTIONALITY OF DIFFERENTIAL TAX TREATMENT OF LOBBYING

When *Cammarano v. United States* was decided in 1959, its foundation was the congressional "neutrality" toward lobbying that existed at the time of the decision. *See* 358 U.S. at 513, 79 S.Ct. at 533.[29] Since that time, Congress has departed substantially from the policy that government should not subsidize *any* lobbying. Taxation claims that the refusal to subsidize lobbying by Section 501(c)(3) organizations to the same extent that lobbying by other Section 501(c) organizations is subsidized constitutes a violation of equal protection.

On these facts, we agree. In the starkest terms, Congress has used the Code, perhaps inadvertently, to do one of two things. If veterans' organizations and organizations such as Taxation lobby on different sides of the same questions, Congress has chosen to favor one lobbyist on a particular issue over another. If veterans' organizations and Section 501(c)(3) organizations lobby on entirely distinct matters, Congress has ensured that greater attention will be devoted to some causes than others. Either outcome is unconstitutional unless an evaluation of the differential treatment in terms of the heightened level of scrutiny appropriate here demonstrates that there is an important governmental interest justifying the First Amendment preference. We turn to that question now.

### A. State Interests Furthered by the Classification

Before the court can determine whether a substantial governmental interest supports the differential classification under review, it must first determine what interests are said to justify the classifications. Once these interests are identified, it can then be asked whether they are substantial. The pertinent classifications made in the Code are as follows.

#### 1. Business lobbying

On rehearing, Taxation has dropped its equal protection challenge to the right of businesses to deduct lobbying expenses, Taxation Supp. Brief at 18 n.3, and it has not hitherto been necessary to explain these provisions of the Code. Nevertheless, the tax treatment of business lobbying is worthy of some attention because the reasons behind that treatment exemplify the sorts of governmental interests that we seek to identify in this section of the opinion.

I.R.C. § 162(e) permits the deduction of all "ordinary and necessary expenses" incurred in carrying on any trade or business, including lobbying costs incurred in "direct connection" with "legislation or proposed legislation of direct interest to the taxpay-

holding that a Good Government League was not disqualified from receiving deductible contributions because a different construction might violate First Amendment).

29. Indeed, the IRS in *Cammarano* argued against a business deduction for lobbying expenses on the ground that it "would upset the tax equilibrium which existed due to the then existing uniform prohibition against subvention." Garrett, *Federal Tax Limitations on Political Activities of Public Interest and Educational Organizations*, 59 Geo.L.J. 561, 583 & n.38 (1971) (citing Brief for Respondents at 12, *Cammarano v. United States*, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959)).

er." [30] There is a significant difference between profitmaking and nonprofitmaking entities, and it seems probable that each type lobbies with different motives. *See Haswell v. United States*, 500 F.2d at 1150. But the fact that a difference exists does not by itself demonstrate the state interest behind the distinction.

The Senate Report explaining the addition of Section 162(e) in 1962 mentions several policy considerations, however. Lobbying is a cost of doing business, and the deduction of lobbying expenses permits a more accurate measurement of a business' net income. Sen.Rep.No.1881, 87th Cong., 2d Sess. 22–23 (1962), *reprinted in* [1962] U.S.Code Cong. & Ad.News 3304, 3325. The Report mentions three other explanations: the anomaly of allowing deductions for expenses incurred in presenting a business' viewpoint to administrative agencies and the executive branch but excluding the legislative branch; the importance of some legislation to a business' continued existence; and the desirability of encouraging business people to bring relevant information to the attention of Congress. *Id.*

## 2. *Veterans' organizations*

It is far more difficult to identify the governmental interest that is promoted by giving veterans' organizations a lobbying advantage over other Section 501(c) organizations. Just as there are differences between business and nonbusiness groups, of course, veterans groups may be distinguished from other Section 501(c) organizations. As noted above, however, the mere fact that differences exist between any two distinct entities does not demonstrate a substantial state interest that can justify discrimination in the exercise of constitutional rights. Descriptive terms alone

have little relevance in identifying the governmental interest furthered by a differential statutory classification.

The government offers only two state interests that are said to justify preferential tax treatment of lobbying by veterans' organizations. First, veterans deserve substantial benefits and rewards in return for their service to the country. These benefits "compensate them for disruption of civilian pursuits," assist in the "readjustment to civilian life," and help "make military service more attractive." IRS Supp. Brief at 44. Second, the government suggests that legislative activity by veterans' organizations is necessary in order to protect veterans' benefits from subversion by hostile forces. "Since these benefits are provided by legislatures, it is reasonable for Congress to allow veterans' organizations to engage in lobbying activities to preserve their benefits without risk of losing their tax deductible contributions." *Id.*

In identifying the governmental interests furthered by the tax treatment of these groups, however, it must be cautioned that our effort risks becoming a post hoc attempt to rationalize an otherwise inexplicable distinction in the Code. The government made no attempt in the district court to present affidavits or other evidentiary materials. Our identification of the relevant state interests must depend on the legislative history of the statute—but that history is sparse indeed.[31] Despite the apparently unambiguous distinction drawn in the statute, there is no indication in the legislative history of these sections that Congress intended to grant any tax-exempt organization a lobbying advantage over any others. In fact, the scant legislative history that exists is to the contrary, and suggests

---

30. *See* note 9 *supra*. Section 162(e) also permits businesses to deduct indirect lobbying expenditures that are paid as dues to an organization of which the taxpayer is a member, such as a trade association.

31. *See, e.g.*, Memorandum in Support of Cross-Motion by Defendants for Summary Judgment, October 28, 1978, at 5 (legislative history is "surprisingly sparse"); Garrett, *supra* note 29, at 564 ("The statutory history of this amend-

ment is unclear as to the underlying rationale and scope of the prohibition"); Troyer, *supra* note 22, at 1421 (legislative history of the 1934 amendment "is sparse and unclear"); Note, *Regulating the Political Activity of Foundations*, 83 Harv.L.Rev. 1843, 1845 (1970) ("neither the extent of the proscription nor its rationale has ever been clearly enunciated by Congress").

that Congress meant to treat the lobbying of all § 501(c) organizations equally.

Tax exemptions for religious, charitable, and educational organizations—and the correlative provisions permitting taxpayers to deduct their contributions to such groups—are much older than similar treatment of veterans' organizations. Not until after World War One did Congress explicitly extend these benefits to a named veterans' group. Section 214(a) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, accorded exempt status to posts of the American Legion, and it is greatly suggestive that Congress in 1921 viewed the American Legion no differently than any other charitable group. Senator Lodge, who proposed the extension in the Senate, considered it one "to which I think there can be no possible objection," 61 Cong.Rec. 7066 (1921), and the lack of debate bears him out. As enacted, the predecessor section to I.R.C. § 170 simply added the American Legion to other organizations, by allowing deductions for

> Contributions or gifts made within the taxable year to or for the use of: (A) The United States, any State, Territory, or any political subdivision thereof, or the District of Columbia, for exclusively public purposes; (B) any corporation, or community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, *including posts of the American Legion or the women's auxiliary units thereof,* or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual; or (C) the special fund for vocational rehabilitation authorized by section 7 of the Vocational Rehabilitation Act.

Section 214(a)(11), 42 Stat. 241 (emphasis added). In the beginning, then, Congress not only expected that veterans' organizations and charitable groups would be treated equally, but it included both groups in the same subsection of the tax laws.

Congress extended this tax treatment to veterans' organizations generally in 1924.

Section 214(a)(10), Revenue Act of 1924, ch. 234, 43 Stat. 253. By this time, however, the statute had become considerably more detailed, and Congress created a new subsection for the veterans' groups. Contributions or gifts were deductible if given to

> (A) The United States, any State, Territory, or any political subdivision thereof, or the District of Columbia, for exclusively public purposes; (B) any corporation, or community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual; (C) the special fund for vocational rehabilitation authorized by section 7 of the Vocational Rehabilitation Act; (D) posts or organizations of war veterans, or auxiliary units or societies of any such posts or organizations, if such posts, organizations, units, or societies are organized in the United States or any of its possessions, and if no part of their net earnings inures to the benefit of any private shareholder or individual; or (E) a fraternal society, order, or association, operating under the lodge system, but only if such contributions or gifts are to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals.

Section 214(a)(10), 43 Stat. 271. Again, however, the legislative history creates no inference that Congress sought to treat these groups differently than charitable organizations. The change was approved without comment on the floor in either house, *see* 65 Cong.Rec. 2860, 7126 (1924), and received almost no mention in the reports accompanying the revenue act. *See* S.Rep.No. 398, 68th Cong., 1st Sess. 24 (1924); H.R.Rep.No. 844, 68th Cong., 1st Sess. 18 (1924). It is also noteworthy that Congress enacted the same restrictions concerning earnings that inured to the benefit of private individuals for both types of organizations.

The lobbying limitation on charitable organizations was not enacted until 1934, and it is true that Congress inserted it only in the subsection of the statute dealing with charitable organizations. Section 23(*o*)(2), Revenue Act of 1934, 48 Stat. 690. This may simply have been a drafting oversight, however. Indeed, Senator Harrison, the chairman of the reporting committee, suggested that a more carefully drafted amendment would apply to "war organizations" as well:

In considering that amendment, as I recall, the sentiment of the committee was that the provision ·should apply to *any* organization that is receiving contributions, the proceeds of which are to be used for propaganda purposes or to try to influence legislation.

I called the attention of the experts to the fact that it seemed to me the proviso at the end of the second paragraph [the lobbying provision] *should apply to all four paragraphs.* Of course, *that would affect some war organizations,* but personally I see no difference between one organization that might be on one side of the fence getting contributions to propagandize and influence legislation and being permitted to proceed without interference, while at the same time preventing one that might have a different viewpoint from receiving or making use of contributions for the same purpose.

78 Cong.Rec. 5861 (1934) (emphasis added). Senator LaFollette, another member of the Senate Finance Committee, agreed to the desirability of uniformity:

I recognize . . . that there are certain types of organizations to which Congress and the executive branch of the Government might desire to encourage contributions. . . . In my opinion, it will not make a penny's worth of difference, so far as the contributions to these various

organizations are concerned, *if they are all excluded from this immunity and all treated alike.* It is my judgment that we never shall get away from mistakes of administration and from decisions which may seem like favoritism until all contributions to organizations of this kind are made subject to the income tax.

*Id.* at 5959. *See id.* at 5861 (Senator Reed) (stating "no disagreement" with Senator Harrison's remarks). The amendment was eventually agreed to with the understanding that it would undergo redrafting by the conference committee. *See* 78 Cong. Rec. 5959 (Senator Couzens) (amendment should "go to conference, and we can change the language if it is found to do any inequity"); *id.* (Senator Reed) ("if the amendment shall be agreed to we will have from now until the conference to study the subject and prepare better phraseology"). There is no explanation in the legislative history for the fact that the language of the enacted version was identical to that of the amendment as proposed.[32]

Congress has not indicated since 1934 that it specifically wishes to impose the lobbying restriction less than uniformly, other than by enacting a Code that articulates lobbying limitations in some provisions and not others. No stated intent to discriminate among the lobbying activities of various tax-exempt organizations is shown by the 1972 addition of Section 501(c)(19), which created a new subsection for veterans' organizations in Section 501 to correspond with the separate veterans' subsection in Section 170. The legislative history suggests that this addition was only a technical, nonsubstantive amendment designed to correct the tax treatment of certain income by veterans' organizations inadvertently changed by the Tax Reform Act of

---

32. The legislative scheme provides further support for this broad reading of the scope of the 1934 lobbying restriction. When the limitation was enacted, it was added to all relevant portions of the Code—the section establishing an exemption for charitable organizations and the three provisions permitting deduction of charitable contributions for income, estate, and gift

tax purposes. See Revenue Act of 1934, Pub.L. No. 73–216, §§ 101(6), 23(*o*)(2), 406, 517, 48 Stat. 700, 690, 755, 760 (current version at I.R.C. §§ 501(c)(3), 170(c)(2)(D), 2055(a)(2), 2522(a)(2)). There was no intent—and no conceivable reason—to apply the lobbying restriction to some, but not all, of the primary tax benefits accorded exempt organizations.

1969.[33] There is no indication that Congress meant to benefit veterans' organizations vis-a-vis other tax exempt organizations in any respect.[34] Most importantly, in explaining the effect of the new provision the Senate Report noted: "The committee does not intend for any expenditures for lobbying purposes to come under this exception." S.Rep.No. 1082, 92d Cong., 2d Sess. 5 (1972), *reprinted in* [1972] U.S. Code Cong. & Ad. News 3141, 3145.[35] It is therefore difficult to resist the conclusion that the tax preferences for lobbying by veterans' organizations reflect no policy, but simple lack of attention and consistency on the part of Congress and the IRS.

3. *Section 501(c)(3) charitable organizations*

In addition to searching for the governmental interests promoted by preferential treatment of lobbying by veterans' organizations, we must also examine the governmental interests behind restrictive treatment of lobbying by charitable groups and other Section 501(c)(3) organizations. As

the government emphasizes, Congress, when it does not impinge impermissibly upon fundamental rights, "may address a problem 'one step at a time.'" IRS Supp. Brief at 40 (quoting *Jefferson v. Hackney,* 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972)). "[T]he Constitution permits Congress to single out the greatest problems and legislate respecting the most serious abuses, while leaving less serious problems to a later date." IRS Supp. Brief at 42. *See Buckley v. Valeo,* 424 U.S. at 105, 96 S.Ct. at 675; *Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966). If the legislative history demonstrates a compelling reason for Congress to focus with particularity on special problems created by charitable lobbying with tax-deductible dollars, this might suffice to justify the differential treatment indicated in the Code sections before us.

Initially, it does seem far easier to discern the governmental interests promoted by the lobbying restriction on charitable organizations than those advanced by not extending

**33.** Until 1972, veterans' organizations were themselves exempt from taxation either as social welfare organizations under Section 501(c)(4) or as social clubs under Section 501(c)(7). Until 1969, organizations exempt under these categories were not subject to the unrelated business income tax. The Tax Reform Act of 1969 extended the unrelated business income tax to these categories, however. The 1972 law therefore created a new subsection for veterans' organizations, and added Section 512(a)(4) so that the income that a veterans' organization received from insuring its members and their dependents was not subject to the unrelated business income tax. *See* S.Rep. No. 1082, 92d Cong., 2d Sess. (1972); H.R.Rep. No. 851, 92d Cong., 2d Sess. (1972).

**34.** The 1969 extension of the unrelated business income tax, for example, had been prompted by a desire "to avoid unequal treatment of the various types of tax-exempt organizations." H.R.Rep. No. 413, pt. 1, 91st Cong., 1st Sess. 44 (1969) U.S.Code Cong. & Admin. News 1969, pp. 1645 (amending I.R.C. § 511(a)(2)(A)). The 1972 revision was based on a similar concern. *See* 118 Cong.Rec. 6033 (1972) (Rep. Mills) ("the veterans' organizations should not be taxed on this insurance income since other exempt organizations are permitted to insure their members without being taxed on the income from this activity"); *id.* (Rep. Matsunaga) (bill "would place veter-

ans' organizations in exactly the same tax position as fraternal beneficiary associations now enjoy").

**35.** The government argues that this language modifies only income received from insurance activities and set aside for charitable purposes under Section 512(a). IRS Supp. Brief at 38 n.33. Even if this reading is correct, great weight should still be given to the restriction. The new rule excluded from the unrelated business income tax all insurance receipts used or set aside for insurance benefits "or for religious, charitable, scientific, literary, educational, etc., purposes" *that were then identified* as "the purposes specified in sec. 170(c)(4)." S.Rep.No.1082, at 5, U.S.Code Cong. & Admin. News 1972, p. 3145. These purposes, the Report said,

are to include programs involving Americanism, youth activities, community activities, and information and educational programs relative to national security and foreign affairs for purposes of this provision.

*Id.* If these "purposes specified in sec. 170(c)(4)" do not include lobbying when income is derived from one source, it is hard to see how they can include lobbying simply because income is derived from a different source.

this restriction to veterans' groups. Federal tax exemptions for religious, charitable, and educational organizations are as old as the Income Tax Act of 1894,[36] but there were no statutory limitations on the lobbying activities of exempt organizations for the next forty years. As described above, Congress amended the tax laws in 1934 to make clear that what are now Section 501(c)(3) organizations were not to engage in substantial lobbying activities. Unlike the legislation concerning veterans' organizations, the lobbying restriction was enacted only after a number of explanatory remarks by members of Congress, and this makes it seem relatively easy to identify the governmental interests promoted by the measure.

In discussing the amendment on the floor of the Senate, for example, Senator Harrison explained:

> the attention of the Senate committee was called to the fact that there are certain organizations which are receiving contributions in order to influence legislation and carry on propaganda. The committee thought there ought to be an amendment which would stop that, so that is why we have put this amendment in the bill.

78 Cong.Rec. 5959 (1934). Senator Reed, who was also a member of the reporting committee, addressed

> what we were trying to do by this amendment. There is no reason in the world why a contribution made to the National Economy League should be deductible as if it were a charitable contri-

bution if it is a selfish one made to advance the personal interests of the giver of the money. . . .

*Id.* at 5861. These statements suggest that Congress acted to curb what it regarded as abuses by Section 501(c)(3) organizations then eligible to use tax-deductible contributions for lobbying activities. Based partly on these comments, the district court below articulated three "legitimate governmental purposes" served by the lobbying restriction: "assurance of governmental neutrality with respect to the lobbying activities of charitable organizations; prevention of abuse of charitable lobbying by private interests; and preservation of a balance between the lobbying activities of charitable organizations and those of non-charitable organizations and individuals." Memorandum Order, J.A. 62.

It would be grossly simplistic to read too much into these comments, however. Legislation is never passed in a vacuum, and any genuine understanding of its purpose must take some account of what conditions were before it was enacted. There is an early history of restrictions on political activity by charitable organizations well preceding the 1934 statutory change. In 1919, for example, the Treasury provided by regulation that "associations formed to disseminate controversial or partisan propaganda are not educational within the meaning of the statute." Treas. Reg. 45, art. 517 (1919), in T.D. 2831, 21 Treas.Decs.Int.Rev. 285 (1920). The principle was successfully applied in several cases before the Board of Tax Appeals in the 1920s,[37] and was central

---

**36.** Act of August 27, 1894, ch. 349, 28 Stat. 509 (held unconstitutional in *Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108 (1895)). A similar exemption provision was included in the Income Tax Act of 1913, ch. 16, 38 Stat. 114, and subsequent revenue acts. The correlative provision permitting taxpayers to deduct contributions from their income taxes was enacted in 1917. War Revenue Act, ch. 63, 40 Stat. 300, 330 (now I.R.C. § 170).

**37.** *See, e.g., Herbert E. Fales*, 9 B.T.A. 828 (1927) (evidence indicated that Scientific Temperance Federation, Massachusetts Anti-Saloon League, Massachusetts Anti-Cigarette League,

and International Reform Bureau were formed to disseminate controversial propaganda); *Sophia G. Coxe*, 5 B.T.A. 261 (1926) (League to Enforce Peace not exclusively charitable). *See generally Jackson v. Phillips*, 96 Mass. (14 Allen) 539 (1867) (trust to promote "women's rights" not charitable); *Bowditch v. Attorney General*, 241 Mass. 168, 134 N.E. 796 (1922) (trust for promotion of temperance held charitable). The later case of *Slee v. Commissioner*, 42 F.2d 184 (2d Cir. 1930), was widely followed. *E.g., James J. Forstall*, 29 B.T.A. 428, 436 (1933); *Leubuscher v. Commissioner*, 54 F.2d 998, 1000 (2d Cir. 1932); *Weyl v. Commissioner*, 48 F.2d 811, 812 (2d Cir. 1931).

to Judge Learned Hand's opinion in *Slee v. Commissioner*, 42 F.2d 184 (2d Cir. 1930):

> Political agitation as such is outside the statute, however innocent the aim, though it adds nothing to dub it "propaganda," a polemical word used to decry the publicity of the other side. Controversies of that sort must be conducted without public subvention; the Treasury stands aside from them.

*Id.* at 185. Obviously, because of the close connection in the statute between veterans' organizations and other charitable groups, the regulations and judicial pronouncements presumably applied to veterans' organizations too.

These restrictions on political activity by charitable organizations prior to 1934 make it difficult to interpret the congressional intent behind the 1934 amendment with total confidence. "In view of the existing case law on the subject, it is not clear what the proponents of the legislation sought to accomplish." Clark, *The Limitation on Political Activities: A Discordant Note in the Law of Charities*, 46 Va.L.Rev. 439, 447 (1960). The addition to the statute may have been meant simply to codify preexisting regulation of charitable organizations. To a great extent, however, commentators hold the view that the 1934 enactment was a reform measure intended to liberalize the case law.[38] It appears that the proponents wanted to restrict selfishly motivated political agitation, meant to secure some personal interests of the donor, without providing

that all political activity by charitable organizations was inherently improper. The breadth of the lobbying restriction has therefore been attributed primarily to the inability of Congress to draft a more "appropriate" test.[39] This theory finds support in the debates. Senator Reed, who was also a member of the Senate Finance Committee, observed on the floor that "we found great difficulty in phrasing the amendment. I do not reproach the draftsmen. I think we gave them an impossible task; but this amendment goes much further than the committee intended to go." 78 Cong.Rec. 5861 (1934).

Whatever the strength of these views, they strongly suggest that the 1934 amendment applying only to charitable organizations cannot automatically be presumed to show that Congress addressed only "the phase of the problem which seem[ed] most acute to the legislative mind." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). If the 1934 amendment was intended to liberalize the case law, the fact that it applied only to charitable organizations would suggest that Congress meant to treat lobbying by such groups *less* stringently than similar activity by other groups.[40] The legislative history provides no positive assurance for this proposition, of course, but it also fails utterly to demonstrate that Congress restricted the lobbying of charitable organizations because of special problems arising in that area alone.

---

**38.** *See, e.g., Seasongood v. Commissioner*, 227 F.2d 907, 910 (6th Cir. 1955) (courts "have also applied the principle, that the section being remedial must be liberally construed"); Clark, *supra* note 12, at 447; Borod, *supra* note 22, at 1113 (1934 amendments "were intended to some extent to liberalize, rather than restrict, the administration of the revenue laws in regard to charitable organizations"); Caplin & Timbie, *supra* note 6, at 185 ("A persuasive case can be made" that "Congress intended a more limited proscription than a literal reading of the statute would suggest"). The restriction has been widely excoriated. *E.g.,* Note, *The Tax Code's Differential Treatment of Lobbying Under Section 501(c)(3)*, 66 Va.L.Rev. 1513, 1525 (1980); Note, *Political Activity and Tax Exempt Organizations Before and After the Tax Reform Act of 1969*, 38 Geo.Wash.L.Rev.

1114, 1136 (1970) (restriction is "obscure in origin, uncertain in application, and perhaps harmfully outmoded").

**39.** Garrett, *supra* note 29, at 564; *see* Clark, *supra* note 12, at 447.

**40.** Some additional support for this argument may lie in the enactment of Section 501(h) in 1976, *see* note 6 *supra*, which liberalized the rules governing lobbying by charitable organizations by freeing them from the uncertain application of the "substantiality" test. *See Hearings on Legislative Activity by Certain Types of Exempt Organizations Before the House Comm. on Ways and Means*, 92d Cong., 2d Sess. 1 (1972); Geske, *Direct Lobbying Activities of Public Charities*, 26 Tax Lawyer 305 (1972).

## B. *Substantiality of the State Interests*

If there are any other governmental interests furthered by disparate tax treatment of lobbying activities by tax-exempt organizations and other groups, they have not been identified in the legislative history or by the parties in this case. The question now becomes whether any of these interests are sufficiently substantial to justify the differential tax treatment, and if so whether the statute is narrowly tailored to meet them.

 The preceding discussion clearly identified governmental interests that justify allowing businesses to deduct the cost of business lobbying. Because the government assesses taxes on net business income, such deductions are necessary in order to permit accurate measurement of the cost of producing goods and services. In contrast, tax-exempt organizations have no comparable need for a realistic reflection of income. The governmental interest in distinguishing between these two kinds of organizations is a substantial one, and the Code's differentiation between businesses and Section

501(c)(3) organizations is both relevant to that interest and narrowly tailored to serve it.[41]

 The addition of Section 162(e) has import in assessing the strength of the government's analysis in this case, however, because it demonstrates that lobbying is not an inherently improper activity concerning which Congress seeks as much neutrality as possible. Section 162(e) unquestionably demonstrates a decision by Congress to depart from the posture of neutrality toward lobbying that once was affirmed by *Cammarano*.[42] It therefore undercuts any suggestion that because efforts to influence legislation present "well-recognized dangers to representative Government," *Haswell v. United States*, 500 F.2d at 1150, such efforts should never be subsidized through tax deductions.[43] The first of the three governmental interests given by the district court for the restriction on lobbying by charitable organizations—the preservation of governmental neutrality concerning lobbying—therefore disappears.

---

41. The same reasoning supports the deductibility of contributions to unions and business leagues under Sections 501(c)(5) and 501(c)(6). As noted above, such contributions are deductible only to the extent they are "business expenses" under Section 162. *See* note 9 *supra.*

It may be noted in passing, however, that some of the governmental concerns articulated in the reports accompanying the enactment of Section 162(e) are of doubtful constitutional validity. Neither the importance of some legislation to a business' existence nor the desirability of encouraging business people to bring relevant information to the attention of Congress offers a clear and substantial justification for subsidizing lobbying by particular groups over others. *See* S.Rep.No.1881 at 22–23, [1962] U.S.Code Cong. & Ad.News at 3325.

42. *See, e.g.*, Garrett, *supra* note 29, at 583 ("By reversing the Supreme Court, the 1962 amendment to section 162(e) indicates a changed congressional position on subvention, makes defense of the policy difficult since it is no longer uniformly applied, and raises serious first amendment issues regarding whether the restrictions applied to section 501(c)(3) and 170(c)(2) organizations operate discriminatorily to suppress constitutional freedoms"); *Influencing Legislation by Public Charities: Hearings Before the House Comm. on Ways and*

*Means*, 94th Cong., 2d Sess. 68 (1974) (ABA statement):

> [N]ow that direct business lobbying has become a deductible activity under § 162(e), the former "neutral posture of the tax law with respect to lobbying" (see *Cammarano v. United States, supra*) has been upset in favor of the business interests as opposed to the charitable organizations.

The reports accompanying section 162(e) also suggest that federal policy is not neutral, but is one of encouraging business participation in the legislative process. S.Rep.No.1881 at 23, [1962] U.S.Code Cong. & Ad.News at 3325.

43. The Supreme Court has recognized that departures from uniform pursuit of an asserted governmental purpose raise doubts as to whether that purpose is genuinely important. *See, e.g., Metromedia, Inc. v. San Diego*, 453 U.S 490, 516, 101 S.Ct. 2882, 2897, 69 L.Ed.2d 800 (1981) ("exceptions to the general prohibition are of great significance in assessing the strength of the city's interest"); *Schad v. Borough of Mount Ephraim*, 452 U.S. at 73, 101 S.Ct. at 2185 n.14 ("The Borough's decision to permit live entertainment as a nonconforming use only undermines the Borough's contention that live entertainment poses inherent problems that justify its exclusion").

The second such interest, prevention of abuse of charitable lobbying by private interests, also fails to pass constitutional muster under a close scrutiny test. There is no evidence whatsoever that the lobbying of veterans is less subject to abuse by private interests than that of other Section 501(c) groups. Thus, although this interest is doubtless valid, it cannot be suggested that Section 501(c) has been tailored to meet it. We decline the government's invitation to infer that because Congress did not apply the lobbying exemption to all exempt organizations, it saw no problem in according special tax benefits to veterans' organizations despite their lobbying activities. The legislative history discussed above provides no support for such an inference.

The final interest said to require special treatment of lobbying by charitable organizations—"preservation of a balance between the lobbying activities of charitable organizations" and those of other groups— also fails to meet the heightened standard applicable here. There is absolutely no evidence that Congress sought to achieve this objective when it enacted the lobbying restriction in 1934. Even if charities before that time could lobby with deductible contributions, there is no indication that charities had become so powerful that they threatened to drown out the voices of those whose lobbying was not similarly subsidized.[44] Moreover, had this been the intent of Congress, courts would consider such a purpose constitutionally illegitimate. "[W]here, as here, the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First National Bank of Boston v.*

*Bellotti*, 435 U.S. 765, 785–86, 98 S.Ct. 1407, 1420–21, 55 L.Ed.2d 707 (1978); *see id.* at 790–91, 98 S.Ct. at 1423–24. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. at 48–49, 96 S.Ct. at 648–649. The governmental purposes said to require special restrictions on lobbying by Section 501(c)(3) organizations are therefore either illegitimate, insubstantial, or inadequately promoted by a statute that is not narrowly tailored to serve them.

Moreover, the Code's discriminatory treatment of lobbying by veterans' organizations does not even satisfy the test of rationality, much less the heightened level of scrutiny appropriate here. The legislative history of the tax exemptions accorded veterans demonstrates absolutely no governmental interest whatsoever that is served by allowing such groups to conduct substantial lobbying with tax-deductible contributions. The post hoc rationales suggested by the government are constitutionally illegitimate. Allowing veterans to lobby freely in order to protect their benefit programs does not explain why other groups that may be equally dependent upon Congress for support should have less access to the legislature. Other tax-exempt groups, such as universities, are equally beset by hostile forces but are nevertheless limited by Section 501(c)(3) in the amount of lobbying they may do to maintain or increase their level of congressional funding. Finally, it emphatically does not follow that because veterans deserve special benefits in recognition of their service to the country, they are entitled to greater

---

44. Members of this court have suggested that in First Amendment cases, judges should consider only the actual governmental purposes behind challenged legislation rather than possible or hypothetical ones. *See, e.g., Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d at 1128 (Robinson, J., concurring in part) ("courts cannot rely upon aims that apparently never crossed the minds of the legislators, particularly when confronted by the possibility of danger to a fundamental interest") (footnote omitted); *id.* at 1146 & n.51 (Leventhal, J., concurring) ("Courts engaged in the careful scrutiny of legislation ... are not free to conjecture an important governmental interest when one has not surfaced in congressional deliberations."). *Cf. Califano v. Goldfarb*, 430 U.S. 199, 212–17, 97 S.Ct. 1021, 1029–32, 51 L.Ed.2d 270 (1977) (plurality opinion) (examining legislative history of challenged statute to determine "actual purpose" of discrimination, and refusing to accept objectives advanced by appellants because Congress had given no attention to them).

First Amendment rights than other citizens. The First Amendment proscribes governmental efforts to favor one speaker over another. *See, e.g., Carey v. Brown,* 447 U.S. at 462–63, 100 S.Ct. at 2291–92; *First National Bank of Boston v. Bellotti,* 435 U.S. at 784–85, 98 S.Ct. at 1420; *Police Dep't v. Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290. "First Amendment rights may not be used as a type of 'currency' to reward those who have rendered service to the nation or who are otherwise determined to be worthy." Taxation Supp. Brief at 19.

█ In short, the Code's classification according tax benefits to lobbying by some tax-exempt groups but not others does not withstand constitutional scrutiny. No identifiable governmental interests justify the differential tax treatment of lobbying by veterans' groups and Section 501(c)(3) organizations. The distinctions and interests suggested by the government are either completely unrelated to any substantial purpose, or reflect only illegitimate governmental goals. "[I]t has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action." *Baker v. Carr,* 369 U.S. 186, 226, 82 S.Ct. 691, 714, 7 L.Ed.2d 663 (1962) (emphasis by the Court).

C. *The Unconstitutionality of These Classifications*

Because no substantial purpose justifies the disparate treatment of lobbying by Section 501(c) when that statute is subjected to careful scrutiny, the discriminatory treatment of Taxation's First Amendment activities constitutes a denial of equal protection,

and is unconstitutional. Even so, this remains a troublesome case. Congress has enormous leeway in classifying the recipients of its benefits and funds, and in favoring certain groups over others.[45] If Congress provided office space and government surplus furniture to veterans' organizations, for example, as Congress clearly has authority to do, it would indirectly facilitate the lobbying of such groups by freeing up funds that other organizations such as Taxation would have to spend for rent and supplies. Moreover, Congress occasionally appropriates grants for certain groups with the understanding that the money may be used for public education, litigation, and lobbying.[46] Similarly, in other contexts such as National Public Radio and Television, the government directly funds First Amendment activity that by necessity excludes some speakers and favors others. *See* Emerson, *The Affirmative Side of the First Amendment,* 15 Ga.L.Rev. 795, 823–28 (1981); Note, *Freeing Public Broadcasting from Unconstitutional Restraints,* 89 Yale L.J. 719 (1980) (arguing that direct state subsidy of the Public Broadcasting Service violates the First Amendment).

█ We suggest nothing concerning the constitutionality of any of these grants and programs, which of course are not before us. Nevertheless, it may be observed that certain principles do distinguish many of these programs from the lobbying preference now given to veterans. First, it is well established that although government may not directly facilitate the speech of one person over that of another, government too is a rightful participant in the "marketplace of ideas."[47] Examples such as the

---

**45.** Article I, Section 8 of the Constitution empowers Congress to lay and collect taxes and expend public funds for the general welfare. Its powers under this clause are broad. *See Steward Machine Co. v. Davis,* 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).

**46.** *See, e.g.,* 42 U.S.C. § 2996f(a)(5) (1980) (Legal Services Corporation prohibited to use funds to influence passage or defeat of federal or state legislation except in delineated circumstances); 42 U.S.C. § 5653 (1980) (National Institute for Juvenile Justice and Delinquency

Prevention authorized to prepare studies and recommendations and disseminate information to individuals, agencies, and organizations concerned with prevention and treatment of juvenile delinquency).

**47.** *See, e.g., Greer v. Spock,* 424 U.S. 828, 838 n.10, 96 S.Ct. 1211, 1217 n.10, 47 L.Ed.2d 505 (1976); *Toward a Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation,* 417 F.Supp. 632, 638–39 & n.9 (D.R.I.1976) (state can inquire whether applicants proposed use of public area comports with theme speci-

Voice of America and the press offices of executive departments and agencies illustrate the government's authority to communicate with its citizens and the people of the world. Under some conditions, it is possible that the government could also subsidize private groups or speakers in an effort to get its own message across. *Compare Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d at 1110 n.17, *with* Shiffrin, *Government Speech*, 27 U.C.L.A. L.Rev. 565 (1980). Second, the very nature of government may dictate that it alone can provide certain forums for First Amendment expression, from parks with rostrums to a national public television system. First Amendment principles apply to these forums, of course, but they require that access be nondiscriminatory[48] rather than that government not create the facilities at all. Finally, it is possible that a thorough

constitutional analysis of certain programs might well demonstrate that although the government program *does* discriminatorily subsidize certain speakers, the state interest is sufficiently compelling that the discrimination is not unconstitutional. Until other programs that arguably subsidize First Amendment rights in a discriminatory fashion come before us, however, it would be injudicious to undertake any elaborate constitutional analysis of what might now seem analogous situations.

What does remain crucially important, however, is that none of these possible justifications can uphold discriminatory tax treatment of lobbying by different kinds of Section 501(c) organizations. There is a brightline distinction between direct legislative promotion of speech, and indirectly facilitating speech by providing an organization with other kinds of support. It cannot

---

fied by government). The government also possesses editorial powers when it acts as the proprietor of an entity with press rights. *See Avins v. Rutgers, State Univ. of New Jersey*, 385 F.2d 151 (3d Cir. 1967), *cert. denied*, 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968) (state university law review had editorial prerogative of rejecting article). It may be difficult, of course, to distinguish between government-sponsored speech and private speech in close cases. *Compare Bonner-Lyons v. School Committee*, 480 F.2d 442 (1st Cir. 1973) *with Buckel v. Prentice*, 572 F.2d 141 (6th Cir. 1978). *See generally Perry Local Educators' Ass'n v. Hohlt*, 652 F.2d 1286, 1292–96 (7th Cir. 1981); Emerson, *supra* note 23, at 831, 837; Shiffrin, *Government Speech*, 27 U.C.L.A.L.Rev. 565, 577–88 (1980); Yudof, *When Governments Speak: Toward a Theory of Government Expression and the First Amendment*, 57 Tex.L. Rev. 863, 908–12 (1979).

**48.** *See, e.g., Police Department v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Similar principles govern the time, place, and manner restraints that may be applied to First Amendment expression without violating the Constitution. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time"); *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (loudspeakers);

*Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (parades).

In certain situations, the fact that government has created the forum seems to permit some discrimination among speakers that is directed toward content but neutral with regard to viewpoint. *See, e.g., FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (FCC can regulate use of certain words on airwaves); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion) (municipal bus system can permit commercial but not political advertising). *Compare Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (granting claim for access to municipal theatre by promoter of controversial production) *with Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion) (upholding restrictive zoning ordinance for theatres exhibiting sexually explicit films). *See generally* Karst, *Public Enterprise and the Public Forum*, 37 Ohio St.L.J. 247 (1976); Comment, *Access to State-Owned Communications Media—the Public Forum Doctrine*, 26 U.C.L.A.L.Rev. 1410 (1979); Note, *The Public Forum: Minimum Access, Equal Access, and the First Amendment*, 28 Stan.L. Rev. 117 (1975). Other standards may be appropriate where the "forum" is not public at all. *See United States Postal Service v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (upholding statute prohibiting deposit of unstamped "mailable" matter in officially approved mailboxes).

conceivably be argued that the lobbying preference for veterans' organizations demonstrates the government's attempt to get its own message across to the public, because the Code provides open-ended subsidization of any position that these groups choose to espouse even if those positions directly challenge the policy of the government.[49] Without passing judgment on the constitutionality of congressional attempts to advance the message of Congress itself by funding the speech of particular groups, it is clear that Congress cannot write favored organizations a blank check payable on the First Amendment.

## IV. THE CONSTITUTIONAL REMEDY

 Section 501(c)'s disparate treatment of lobbying by particular tax-exempt groups leads to an unconstitutional violation of equal protection principles. The final question before us is the appropriate relief. The most obvious remedy—striking down the Section 501(c)(3) lobbying limitation that now governs Taxation—poses the most obvious problems. The legislative history of that limitation clearly shows a congressional determination that the public in-

terest requires regulating the amount of tax-deductible dollars flowing to Section 501(c)(3) organizations that may be used for lobbying purposes. Extending the lobbying treatment now given to veterans' organizations to all Section 501(c)(3) groups might open a Pandora's Box of woes and abuse. The government notes, for example, that during the 1980 fiscal year, there were 319,842 organizations listed as exempt under Section 501(c)(3), but only 22,247 veterans' groups.[50] In 1978, contributions, grants, and gifts to Section 501(c)(3) organizations aggregated more than $21.9 billion, nearly 1500 times the $16.7 million given to veterans' organizations.[51] If we permitted Section 501(c)(3) groups to lobby as freely as veterans' organizations, there would be a clear risk of abuse by private interests and an increase in the amount of "selfish" contributions "made to advance the personal interests of the giver of the money." 78 Cong.Rec. 5861 (Senator Reed). Even when they attempt to remedy constitutional violations, courts must resist ordering relief that clearly exceeds the legitimate expectations of Congress.[52]

---

**49.** As noted earlier, *see* note 11 *supra*, veterans' organizations have not restricted their lobbying to issues of particular importance to veterans, such as veterans' benefit programs. A particularly notable example is the lobbying of many veterans' organizations against the proposed Panama Canal treaties. *See, e.g., Panama Canal Treaties: Hearings Before the Senate Comm. on Foreign Relations*, 95th Cong., 1st Sess. 566 (1977) (statement of Robert Charles Smith, National Commander, American Legion); *id.* at 578 (statement of Frank D. Ruggiero, National Commander, Amvets); *id.* at 582 (statement of Maj. Gen. J. Milnor Roberts, U. S. Army Reserve, executive director, Reserve Officers Ass'n.); *id.* at 595 (statement of Col. Phelps Jones, USA–Ret., director national security and foreign affairs, VFW); *Proposed Panama Canal Treaties, Hearings Before the House Comm. on International Relations*, 95th Cong., 1st & 2d Sess. 155 (1977–1978) (statement of Dr. John Wasylik, National Commander in Chief, VFW); *id.* at 163 (statement of William J. Rogers, immediate past national commander, American Legion); *id.* at 171 (statement of Frank D. Ruggiero, National Commander, Amvets); *id.* at 175 (statement of Dr. Robert P. Foster, chairman national foreign relations commission, American Legion); *id.* at

177 (statement of Col. Phelps Jones, director national security and foreign affairs, VFW).

**50.** IRS Supp. Brief at 40 (citing IRS Exempt Organizations Master File, 1980 IRS Ann.Rep. 76). The government cautions that this does not represent a true universe of Section 501(c)(3) organizations, however, because certain organizations such as churches need not apply for recognition unless they desire a ruling, and because the ruling letter covers not only the applying organization but all of its subordinate units.

**51.** *Id.* (based on 90 percent of all information returns filed by such organizations for the 1978 taxable year).

**52.** Taxation also implies the existence of a considerably narrower remedy. It claims that the most repugnant feature of the current lobbying limitation in Section 501(c)(3) is that organizations that engage in "substantial lobbying" lose their right to receive *any* tax-deductible contributions and not just those contributions used specifically for lobbying. In his concurring opinion in *Cammarano v. United States*, for example, Justice Douglas suggested that the statute in question would have been found invalid had it denied *all* deductions to an organi-

A second remedy is also possible in this case. As the Supreme Court has recognized, in certain situations benefits may be taken away from a preferred group in order to cure unconstitutionally unequal treatment, even if that group is not before the court. *See, e.g., Welsh v. United States,* 398 U.S. 333, 361–65, 90 S.Ct. 1792, 1807–09, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring in result); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 543, 62 S.Ct. 1110, 1114, 86 L.Ed. 1655 (1942). "The right invoked is that to equal treatment; and such treatment will be attained if either their competitors' taxes are increased or their own reduced." *Iowa-Des Moines National Bank v. Bennett,* 284 U.S. 239, 247, 52 S.Ct. 133, 136, 76 L.Ed. 265 (1931). *Cf. Kirk v. Commissioner,* 425 F.2d 492, 495 (D.C.Cir.), *cert. denied,* 400 U.S. 853, 91 S.Ct. 53, 27 L.Ed.2d 91 (1970) (refusing to reach constitutionality of income exclusion for ministers because even if the statute violated the Establishment Clause, "it would not affect the tax liability in this case. Rather ministers of the gospel would then no longer be entitled to the benefits of the exclusion."). Although a number of cases involving equal protection challenges to underinclusive federal benefit statutes suggest that "exten-

sion, rather than nullification, is the proper course," *Califano v. Westcott,* 443 U.S. 76, 89, 99 S.Ct. 2655, 2663, 61 L.Ed.2d 382 (1979), "[i]n choosing between these alternatives, a court should attempt to accommodate as fully as possible the policies and judgments expressed in the statutory scheme as a whole." *Id.* at 94, 99 S.Ct. at 2665 (Powell, J., dissenting). It seems evident that the legislative judgments expressed in Section 501(c) will be less disturbed by striking down the preferential treatment now accorded the lobbying of veterans' organizations than by extending that treatment to Section 501(c)(3) organizations. The legislative history, suggesting that the current treatment of veterans may have been inadvertent but demonstrating a clear congressional concern to prevent abuse of charitable lobbying by private interests, fully confirms this view.

This remedy appears the most logical and most in accordance with the judgments expressed by Congress. But the veterans' organizations that would be directly affected by nullification of preferential treatment in Section 501(c) have not heretofore been parties to this litigation. Courts must always be cautious when dealing with the interests

zation that spent money to promote or oppose an initiative, rather than simply denying deduction of the money spent in that effort. 358 U.S. at 515, 79 S.Ct. at 534. Taxation therefore suggests that an analogous remedy in this case would be to deny tax-deductibility only in an amount proportionate to the amount of lobbying in which a Section 501(c)(3) organization engaged. *Cf. Harris v. McRae,* 448 U.S. 297, 317 n.19, 100 S.Ct. 2671, 2689 n.19, 65 L.Ed.2d 784 (1980), which held that a "broad disqualification from receipt of public benefits" may be unconstitutional even when a more limited exclusion is permissible. In that case, the Court held that although Congress might decline to subsidize certain medically necessary abortions, a "substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion." *Id.* Taxation argues that precisely the same disproportionate penalty is imposed by Section 501(c)(3) when an organization exercises First Amendment rights fully, and urges that the Constitution requires at the very least that its contributors' deductions be limited only

to the extent of the amounts actually spent on lobbying by a Section 501(c)(3) organization.

Taxation's argument is not without merit, but we decline to grant the alternative remedy for the same reason discussed above. Each of the several hundred thousand Section 501(c)(3) organizations now monitored by the IRS may have hundreds of thousands of separate contributors. For each organization, the IRS would have to ascertain the proportion of lobbying activities to other expenses of the organization, and then trace that percentage through to the individual contributions in order to limit the amount of their deductibility to the same proportion. In a less complex world, this logical scheme might be appropriate, although it would not cure the equal protection violation found here. But this remedy could easily overload and destroy any IRS capacity for monitoring these organizations and become an administrative nightmare subject to widespread disregard or abuse. Although mandating such a remedy is within the authority of Congress, this court should not impose a massive new workload on the IRS that leads to so partial a cure of the discrimination shown here.

of those who have not had an opportunity to present their own arguments and defenses, partly because judicial legitimacy stems in large measure from hearing the views of all those who are directly involved. *See* Fiss, *The Supreme Court, 1978 Term—Foreword: The Forms of Justice*, 93 Harv.L. Rev. 1, 44–46 (1979). It is less significant, though still noteworthy, that Taxation also opposes this solution to the unconstitutionality of Section 501(c).[53] We therefore decline to adopt this remedy at this time.

Accordingly, this case is remanded to the district court with the instruction that it cure the constitutionally invalid operation of Section 501(c) after inviting veterans' organizations to participate in framing the relief. In the interim, of course, the IRS may seek other remedies. It may decide that additional regulations governing lobbying by veterans' organizations—and more diligent enforcement of the lobbying regulations that already govern those organizations—are in fact in accordance with the congressional purpose behind Section 501(c).[54] The IRS and veterans' groups might also seek from Congress a clearer determination of the purposes, if any, that Congress had in mind when it enacted legislation giving preferential tax treatment to lobbying by veterans, or passage of more narrow legislation that could show that veterans' groups actually speak for Congress in advocating specific kinds of veterans' programs and benefits. On the record before us, however, it is not even clear that Section 501(c)'s unequal application reflects any congressional intent whatsoever. The broad tax support provided to veterans' organizations for lobbying on any side of any issue they choose, and the companion restriction on lobbying by charitable groups and other Section 501(c)(3) organizations, creates an unconstitutional disparity. Exactly how this problem should be cured is

not a matter that should be decided initially by this appellate court, especially when all directly affected parties are not before us.

## CONCLUSION

■■ The First Amendment occupies a preferred place in our scheme of government. *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945). This does not mean, however, that its application in a legal dispute is always simple. The lines will seem clearer when Congress directly prohibits a particular group from speaking in a particular place, and more confused when Congress subsidizes First Amendment expression unevenly through the intricacies of the Internal Revenue Code. Nevertheless, the principle remains the same. Because the Code differentiates in its treatment of protected First Amendment activity by various tax-exempt organizations, the constitutionality of its classifications must be judged by a heightened level of scrutiny.

■■ When viewed in that light, there can be no question that the suggested distinctions between Taxation and preferred tax-exempt organizations are constitutionally meaningless. Discrimination in government subsidization of First Amendment rights must be narrowly tailored to meet a substantial state purpose, and the proffered distinctions between the favored groups and Section 501(c)(3) organizations are either unrelated to any governmental interest whatsoever or are illegitimate bases for governmental classification. Indeed, although it has not been necessary to reach the question, it is possible that these discriminations could not even be upheld under a test asking whether they were "rationally related to a legitimate governmental purpose," for the discrimination may have been nothing more than an accidental or inadvertent result of legislative drafting.

**53.** Taxation Supp. Brief at 20 n.4. In *Iowa-Des Moines Bank v. Bennett*, 284 U.S. at 247, 52 S.Ct. at 136, the Court ordered a refund of "the excess of taxes exacted" from appellants because "it is well settled that a taxpayer who has been subjected to discriminatory taxation through the favoring of others in violation of federal law, cannot be required himself to as-

sume the burden of seeking an increase of the taxes which the others should have paid."

**54.** The IRS presumably came to analogous conclusions concerning the treatment of lobbying by fraternal beneficiary societies, despite the apparent silence of the Code on that question. *See* pp. 720–721 *supra*.

Tax discrimination against the lobbying of Taxation and similar tax-exempt organizations therefore fails to meet the constitutional standard appropriate here. We reverse and remand this case with instructions that the unequal treatment be cured, either by restricting the tax benefits accorded veterans' organizations or by extending those benefits to Section 501(c)(3) organizations. Even in the arcane intricacies of the tax code, the government cannot give special voice nor lend special ear to any person or group no matter how worthy their ideas or their credentials. The exacting standards of the First Amendment do not allow the government to provide a preferred place for certain parties—at least not without a more substantial state purpose than has been shown here.

*Reversed and remanded.*

MacKINNON, Circuit Judge (dissenting).

Appellant Taxation with Representation of Washington (Taxation) is incorporated as a nonprofit charitable and educational organization whose purpose is to represent the general public on tax issues before Congress, the courts, and the executive branch. After its incorporation in June 1977, Taxation applied to the Internal Revenue Service (IRS) for a declaration that it was an organization described in § 501(c)(3) of the Internal Revenue Code (Code), 26 U.S.C. § 501(c)(3). Although Taxation may otherwise have qualified for section 501(c)(3) status,[1] the IRS determined that Taxation intended to devote a substantial part of its activities to "attempt[s] to influence legislation" by lobbying Congress on matters involving the federal tax system. The effect of that determination, the correctness of which Taxation does not contest, was to deprive it of several tax advantages, including exemption from certain taxes on its own activities[2] and the eligibility to receive tax deductible contributions.[3] (These advantages are referred to collectively herein as the "tax benefits" accruing to organiza-

1. Section 501(c)(3) applies to:
 Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, *charitable*, scientific, testing for public safety, literary, or *educational* purposes . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual, *no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation* (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.
 (emphasis added). Such organizations are exempt from taxation under the income tax subtitle unless such exemption is denied under I.R.C. §§ 502, 503, or 504, sections with which we are not concerned in this appeal. Wholly apart from the issues raised by the lobbying restriction, it could be seriously questioned how an organization the avowed purpose of which is the lobbying of Congress has a 'religious, charitable, scientific, testing for public safety, literary or educational purpose' that brings it within § 501(c)(3) in the first instance.

2. Tax benefits accruing to a § 501(c)(3) organization include: exemption from income tax by virtue of § 501(a); exemption from § 3111(a)'s federal social security (FICA) taxes by virtue of § 3121(a), (b)(8)(B); and exemption from § 3301's federal unemployment (FUTA) taxes by virtue of § 3306(b), (c)(8).

3. I.R.C. § 170 provides for the deduction of contributions from income tax:
 (a) *Allowance of deduction.*—
 (1) General rule.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. . . .
 (c) *Charitable contribution defined.*—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—
 . . . .
 (2) A corporation, trust, or community chest, fund, or foundation—
 (A) created or organized in the United States or any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;
 (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals;
 (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

tions qualifying under section 501(c)(3).) Taxation may still qualify for tax exemption on its own income as a social welfare organization under I.R.C. section 501(c)(4).[4] That subsection, however, while placing no restrictions on an organization's lobbying activities, does not result in donors being permitted to *deduct contributions* from their own income, gift and estate taxes.[5]

After exhausting its administrative remedies, Taxation brought a declaratory judgment action against the Commissioner of Internal Revenue under 26 U.S.C. § 7428 (1976),[6] seeking a declaration that section 501(c)(3)'s restriction of substantial attempts to influence legislation is unconstitutional. The district court granted the Commissioner's motion for summary judgment, *Taxation with Representation of Washington v. Blumenthal*, 43 A.F.T.R.2d (P–H) ¶ 79–419 (1979), and on appeal, a divided panel of this court affirmed. *Taxation with Representation v. Blumenthal*, No. 79–1464 (D.C. Cir. April 14, 1981). On June 11, 1981, this court voted to hear the case *en banc*, which under our rules vacates the panel opinions. The court's order stated that the hearing *en banc* would focus upon two issues: (1) the standard of review applicable to the challenged statutory scheme, and (2) the ultimate constitutionality of the Code's distinction between fraternal and veterans' organizations on the one hand and section 501(c)(3) exempt organizations on the other.[7]

## I.

A case raising the same issue presented here was decided against one of Taxation's predecessor organizations[8] by the Fourth Circuit in *Taxation with Representation v. United States*, 585 F.2d 1219 (4th Cir. 1978), *cert. denied*, 441 U.S. 905, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979). The district court in this case followed that decision in disposing of Taxation's contentions. 43 A.F.T.R.2d (P–H) ¶ 79–419 at 79–681. For the reasons set forth in the margin, I find the present

(D) *Which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation*, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. [Emphasis added.]

Similar language permits donors to make analogous deductions with respect to the gift tax, I.R.C. § 2522(a)(2) (citizens or residents) & (b)(2) (nonresident aliens), and the estate tax, I.R.C. §§ 2055(a)(3) (citizens or residents) & 2106(a)(2)(A)(ii) (nonresident aliens).

In addition, foundations may be deterred from contributing to an organization that fails the lobbying test for section 501(c)(3) status because otherwise untaxed foundations and their managers are subject to tax if the foundation pays any amount "to carry on propaganda, or otherwise to attempt, to influence legislation." I.R.C. § 4945(a), (d)(1).

4. Section 501(c)(4) applies to:

Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

Taxation is the product of a merger between two organizations, one (Taxation with Representation Fund) a § 501(c)(3) group devoted to courtroom advocacy, and the other (Taxation with Representation) a § 501(c)(4) group devoted to legislative advocacy. *See* J.A. at 16.

5. Taxation could also seek to qualify under I.R.C. § 501(h), which permits some § 501(c)(3) organizations to devote specified quantities of their exempt purpose expenditures to lobbying, rather than adhere to the less certain "substantiality" test of § 501(c)(3). In the district court, however, Taxation expressly disavowed any intention to make an election under § 501(h). J.A. at 15–16. *See* discussion at 755–756 *infra*.

6. Section 7428 authorizes certain courts to issue declaratory judgments in certain cases relating to the status and classification of organizations under 26 U.S.C. § 501(c)(3).

7. Taxation also originally challenged the validity of permitting businesses to deduct their lobbying expenses as "ordinary & necessary" business expenses. *See* I.R.C. § 162(e). That contention was not pursued before the court *en banc*, and we do not reach its merits here.

8. *See* note 4 *supra*.

suit not barred by the doctrine of res judicata, and therefore address the merits.[9]

Taxation challenges the Tax Code's denial of tax benefits to otherwise qualified organizations which engage in substantial lobbying on what it views as two independent grounds. First, it asserts that section 501(c)(3), by conditioning tax benefits on the non-exercise of an organization's rights of speech, press, and petition, violates the first amendment. This attack does not rely on any distinctions drawn by the Code among organizations, but rather proceeds from the premise that the lobbying restriction is invalid, regardless of the uniformity of its application, as a burden on protected speech. See Taxation Br. at 15. Second, Taxation argues that the Code, by placing restrictions on the lobbying activities of section 501(c)(3) organizations while placing no similar restrictions of those of veterans' organizations defined in section 501(c)(19) or fraternal orders defined in sections 501(c)(8) and (10), denies it the equal protection of the laws guaranteed by the fifth amendment's due process clause.[10]

**9.** Taxation's papers in the district court made clear that it absorbed the functions of the taxpayer organization that lost in *Taxation with Representation. See* J.A. at 16–18. The record before the district court also establishes that Taxation has the same chief executive as had Taxation with Representation, the appellant in the Fourth Circuit case, *compare id.* at 14 *with id.* at 16, and employs the same attorney, *compare id.* at 6 *with* 585 F.2d at 1220. Despite this close relationship between issues and parties, the Government has not pleaded or argued that Taxation should be precluded, as a matter of res judicata or collateral estoppel, from litigating the issues the Fourth Circuit decided against Taxation with Representation.

Although collateral estoppel and res judicata are waivable affirmative defenses under Fed.R. Civ.P. 8(c), some courts have addressed the preclusion issue *sua sponte* where information within their notice has effectively relieved the defendant of his usual burden of proof on the issue. *E.g., Boone v. Kurtz,* 617 F.2d 435, 436 (5th Cir. 1980) ("[E]ven though Fed.R.Civ.P. 8(c) denominates res judicata as an affirmative defense[,] [d]ismissal by the court *sua sponte* on *res judicata* grounds ... is permissible in the interest of judicial economy where both actions were brought before the same court"); *Gullo v. Veterans Coop. Housing Ass'n,* 269 F.2d 517, 517 (D.C.Cir.1959) (trial court may apply res judicata upon taking notice of parties' previous case); *Wilson v. United States,* 166 F.2d 527, 528–29 (8th Cir. 1948) (appellate court on own motion may determine action is barred by res judicata); *Holmes v. United States,* 231 F.Supp. 971, 972–73 (N.D.Ga.1964), *aff'd,* 353 F.2d 785 (5th Cir. 1965) (court, apparently on own motion, took judicial notice of prior proceedings and applies res judicata on defendants' motion for summary judgment). *Accord, cases cited in United States v. Sioux Nation,* 448 U.S. 371, 432, 100 S.Ct. 2716, 2749, 65 L.Ed.2d 844 (1980) (Rehnquist, J., dissenting). *See also Southern P. R.R. v. United States,* 168 U.S. 1, 55–61, 18 S.Ct. 18, 29–32, 42 L.Ed. 355 (former judgment held conclusive even though estoppel not specially pleaded).

The rationale for *sua sponte* action on questions of preclusion is that relitigation should be precluded not simply to serve defendant's interest in avoiding litigation, but also to avoid judicial waste and to foster reliance on judicial decisions. *Wilson v. United States, supra,* 166 F.2d at 528–29; *see generally Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979) *and authorities cited.* The defendant's consent to relitigation cannot always be decisive, for there is an independent public interest "in preventing the misallocation of judicial resources and second guessing prior panels of Art. III judges when the issue has been fully and fairly litigated in a prior proceeding." *United States v. Sioux Nation, supra,* 448 U.S. at 433, 100 S.Ct. at 2749 (Rehnquist, J., dissenting).

We are thus tempted to determine whether Taxation should be estopped to litigate the same issues on which Taxation with Representation lost in the 4th Circuit. However, the Government's failure to plead preclusion at any stage of this litigation deprived Taxation of an opportunity to argue that such defense should not apply, and it is not clear that Taxation has no arguable objection to such application. We thus have a choice of remanding for a hearing on that issue, *see, e.g., Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (remanding to permit defendant to plead collateral estoppel and plaintiff to challenge the plea), or of disposing of Taxation's case on the merits. The original panel determined that judicial economy would be best served by taking the latter course, and so proceeded to the substantive issues, as we have determined to do here.

**10.** "[I]f a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment." *Johnson v. Robison,* 415 U.S. 361, 364 n.4, 94 S.Ct. 1160, 1164 n.4, 39 L.Ed.2d 389 (1974). *See Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

## II.

Taxation's first claim is based on the contention that the statutory denial of tax benefits to organizations that engage in substantial lobbying places an "unconstitutional condition" upon the enjoyment of those benefits.[11] The cornerstone of this argument is *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), in which the opinion of Justice Harlan for the Court established the proposition that the enjoyment of a government-conferred benefit cannot be made contingent upon compliance with a condition that violates the first amendment rights of one who would otherwise qualify for the benefit.[12] Taxation urges that the lobbying restriction in section 501(c)(3) imposes precisely such a condition. This contention, as the majority recognizes, is without merit.

Taxation does not claim that the challenged provisions "chill" its speech by imposing a *direct* restriction or penalty upon its lobbying activities. Nor, moreover, does it claim that the effectiveness of its presumed "charitable and educational" activities—in fact, lobbying of Congress—is diminished by the bare fact, without more, of its non-exempt status. Taxation's claim is confined to the assertion that because it does not qualify as an exempt organization under section 501(c)(3), it is rendered significantly less able to raise funds in support of its activity.[13] Even if government has no obligation to support its activities either directly or through the tax structure, Taxation argues, the decision to provide or withhold such support cannot permissibly turn upon whether or not it exercises its first amendment right to lobby.

The condition placed upon Taxation plainly has its *direct* effect not upon speech, but upon fundraising. This fact does not, however, render the protections of the first amendment inapplicable, for it is well established that "the Constitution's protection is not limited to direct interference with fundamental rights." *Healy v. James*, 408 U.S. 169, 183, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972). "Even where a challenged regulation restricts freedom of expression only incidentally," the first amendment demands heightened judicial sensitivity. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 n.7, 101 S.Ct. 2176, 2183 n.7, 68 L.Ed.2d 671 (1981). *See also Buckley v. Valeo*, 424 U.S. 1, 21, 96 S.Ct. 612, 635, 46 L.Ed.2d 659 (1976); *Bates v. City of Little Rock*, 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). The question whether the condition placed upon exempt status by section 501(c)(3) violates any right guaranteed Taxation by the first amendment therefore deserves thorough examination.

I agree that lobbying is an activity generally protected by the first amendment. I also agree for the purposes of this case that Taxation possesses in general the same rights of speech and petition guaranteed other persons. *See First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). But in my view, under the specific circumstances of this case, Congress could constitutionally condition the availability of tax benefits upon an agree-

---

11. We consider primarily the denial of tax exemption for Taxation's own income, but note that there is no serious question as to Taxation's standing to challenge conditions upon the deductibility of donors' contributions to it. It is our understanding that in doing so, Taxation is asserting its *own* rights, and not the rights of third party potential donors not before the court.

12. *Speiser* invalidated a requirement that persons seeking to qualify for a state constitutional property tax exemption for veterans sign a loyalty oath. The Court held that the requirement improperly created a presumption of disloyalty on the part of applicants the burden of overcoming which impermissibly chilled the applicants' exercise of their speech rights. "The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the state must bear these burdens." 357 U.S. at 526, 78 S.Ct. at 1342.

13. As the Supreme Court has noted, many contributors "simply will not make donations to an organization that does not appear" on the Cumulative List of exempt organizations published by the IRS. *Bob Jones University v. Simon*, 416 U.S. 725, 729–30, 94 S.Ct. 2038, 2042–43, 40 L.Ed.2d 496 (1974).

ment not to engage in substantial lobbying. In this instance, the reach of Taxation's right to lobby can be determined only in the context in which that right is asserted.[14] By holding itself out as a charitable or educational organization and laying claim to the tax benefits accorded such organizations, Taxation has assumed a status which Congress may constitutionally regard as incompatible to some extent with the carrying on of substantial political activities, and which may therefore be made subject to conditions upon its enjoyment that would otherwise be impermissible.

In first amendment cases, the threshold question of the level of scrutiny applicable to the challenged provision turns upon whether the alleged restriction is one based upon the "content" of the communication sought to be protected. Where speech is restricted because of its content rather than because of its incidental effects on governmental interests the Constitution demands strict judicial scrutiny. Satisfaction of that standard requires the government to demonstrate "that its regulation is necessary to serve a compelling interest and that it is narrowly drawn to achieve that end." *Widmar v. Vincent*, —— U.S. ——, ——, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981). In contrast, where a restriction, though trenching on speech, is directed not at the content of the speech, but at the "non-speech" elements of the restricted activity, government bears the considerably lighter burden of showing that the restriction furthers an "important or substantial governmental interest" and is "no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). *See Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 540 n.9, 100 S.Ct. 2326, 2335 n.9, 65 L.Ed.2d 319 (1980).

For the reasons set forth below, I view the lobbying restriction in section 501(c)(3) as one unrelated to the content of protected speech. I have no difficulty in finding that the governmental interest expressed by the restriction is a substantial one, and that the means Congress has chosen to protect that interest are sufficiently narrow to satisfy the Constitution. Consequently, in my opinion Taxation's argument that the lobbying restriction in section 501(c)(3) is an "unconstitutional condition" upon the enjoyment of the tax benefits Taxation seeks to finance its substantial lobbying should be rejected.

### A.

Taxation argues that the lobbying restriction is one "based on the type of speech or the subject matter" of protected expression, and therefore merits strict scrutiny. Taxation Br. at 15. However, the argument plainly fails when one compares section 501(c)(3) with the types of statutes invalidated by the Supreme Court as "content-based" restrictions on speech. Section 501(c)(3) is not a restriction based on content. It is not aimed at the "message" or "communicative impact" of Taxation's activities, but rather at confining tax-supported organizations to those activities Congress deems worthy of encouraging by public support through the tax system. The restriction is directed neither toward controlling what Taxation's audience may hear, nor toward controlling Taxation's message because of its viewpoint or subject matter. It simply regulates the activities of an entity which happens to be, *inter alia*, a speaker, and is imposed for reasons wholly unrelated to the message Taxation seeks to convey.[15] The fact that the statute in terms specifically restricts activities a "substantial

14. As Taxation conceded in its brief before the original panel in this case, "in establishing a benefit program, the Government may include requirements that are necessary to assure that the objects of the program are attained." Taxation Br. filed 8/1/79 at 14 n.5. *See Buckley v. Valeo*, 424 U.S. 1, 57 n.65, 96 S.Ct. 612, 653 n.65, 46 L.Ed.2d 659 (1976); *Community-Ser-*

*vice Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1129 (D.C.Cir.1978) (en banc); Note, *Unconstitutional Conditions*, 73 Harv.L. Rev. 1595, 1600 (1960).

15. *See generally* Redish, *The Content Distinction in First Amendment Analysis*, 34 Stan.L. Rev. 113, 114–18 (1981).

part" of which is "carrying on propaganda, or otherwise attempting to influence legislation" cannot support the inference that the provision is one aimed at any particular subjects or viewpoints.

The Supreme Court's decisions invalidating content-based restrictions on speech demonstrate that strict first amendment scrutiny is reserved for those instances in which the government has sought specifically to "dictat[e] the subjects about which persons may speak and the speakers who may address a public issue." *First National Bank v. Bellotti*, 435 U.S. 765, 785, 98 S.Ct. 1407, 1420, 55 L.Ed.2d 707 (1978). The application of this high standard is appropriate "[e]specially where ... the legislature's suppression of free speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views. ..." *Id.* Even where the motive of Congress in enacting a restriction bearing on speech has been claimed to be non-neutral with respect to content, *see United States v. O'Brien, supra,* the Court has refused to apply strict scrutiny. It has confined application of that test to cases in which the government's asserted interest is *directly related* to the *content* of the restricted communication. *See, e.g., Widmar v. Vincent, supra,* —— U.S. ——, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (invalidating, on free speech grounds, state university rules that generally permitted use of campus facilities but denied use for religious purposes); *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (invalidating ordinance that permit-

ted commercial expression while prohibiting noncommercial expression in identical circumstances); *Central Hudson Gas & Electric Co. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (invalidating regulation that prohibited utility from promoting use of electricity); *Consolidated Edison Corporation v. Public Service Commission,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (invalidating regulation that prohibited utility from expressing views on "controversial issues of public policy"); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (invalidating ordinance that permitted labor picketing while prohibiting other picketing); *Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (same).[16]

Where neither discrimination among viewpoints nor among subjects of discussion is involved, the concerns prompting strict scrutiny are absent. The lobbying restriction imposed in section 501(c)(3) does not "dictat[e] the *subjects* about which persons may speak and who may address a [given] public issue," and certainly does not "suggest[ ] an attempt to give one side of a debatable public question an advantage in expressing its views ..." *First National Bank v. Bellotti, supra,* 435 U.S. at 785, 98 S.Ct. at 1420 (emphasis added). The statute merely reflects Congress' determination that groups claiming exemption from the normal obligations imposed by the tax laws must devote the resources thereby gained to the purposes for which Congress granted the exemption in the first place.[17]

---

**16.** We focus on cases relating to content restrictions based upon *subject matter* because they involve the Court's broadest reading of the term "content." In cases involving the invalidation of restrictions based on the *particular viewpoint* of a speaker on a given subject, the distinction between such restrictions and § 501(c)(3) is even plainer. *See, e.g., First Nat'l Bank v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (invalidating statute which limited corporate speech to protection of corporations' business interests).

**17.** This is not the type of legislative directive to "stick to business" invalidated in *First National Bank v. Bellotti, supra,* 435 U.S. at 785, 98 S.Ct. at 1420 ("If a legislature may direct business

corporations to 'stick to business,' it may also limit other corporations—religious, charitable or civic—to their respective 'business' when addressing the public."). The statute struck down in that case limited corporate speech on referendum issues to instances in which the corporation's interests were presumed (by the statute itself) to be affected. Section 501(c)(3) does not operate in any way to restrict the subjects upon which Taxation may lawfully speak, nor does it condition Taxation's receipt of tax benefits upon the subjects it addresses. *The lobbying restriction is entirely neutral with respect to the subject matter of the legislation sought to be influenced.* Section 501(c)(3) merely requires charitable and educational or-

The restriction imposed by § 501(c)(3) is not rendered invalid merely because it requires organizations enjoying exempt status to confine themselves to largely non-political activities. The ordinance invalidated in *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), somewhat similarly restricted the activities of charitable groups by requiring that they spend at least 75 percent of their receipts directly for "charitable purposes." A principal difference between that restriction and the one involved here is that the Schaumburg ordinance burdened an activity (solicitation of funds door-to-door) "characteristically intertwined" with speech. A second significant difference, however, is that the restriction in *Schaumburg* was defended primarily as one that sought to prevent fraud upon donors.[18] Section 501(c)(3) has an entirely different purpose. Here, the government has conferred tax benefits on the organization seeking taxpayer support in order to encourage particular kinds of activity in the public interest, and has imposed the lobbying restriction as a means to insure that that benefit is issued *directly* to further the purposes Congress sought to encourage in granting the benefit.[19]

#### B.

The foregoing establishes that this case does not concern a *content*-based restriction on speech. It remains to decide whether the lobbying restriction satisfies the lower standard of first amendment review imposed by *United States v. O'Brien, supra,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).[20] That standard is, as stated above, whether the law in question serves an "important or substantial governmental inter-

est" whose "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679. It is my conclusion that section 501(c)(3) satisfies both concerns.

#### 1. *Governmental Interest*

Taxation argues that there is no clear statement in the legislative history of section 501(c)(3) of the purpose Congress sought to achieve in imposing the lobbying restriction as a condition on the enjoyment of tax benefits, and claims that the statute is therefore supported only by "*post hoc* and speculative arguments of Government counsel, which are constitutionally insufficient." Taxation Br. at 16. I disagree. The interests Congress sought to further are clear, and clearly suffice to justify the statute.

Where legislative intent is manifest in the words or obvious effect of a statute itself, the absence of comment thereon in the hearings, reports, or floor debates of Congress is not to be taken as evidence that the statute is devoid of rational purpose. *See Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 241, 90 S.Ct. 1583, 1587, 26 L.Ed.2d 199 (1970). So-called "*post hoc*" arguments are permissible to interpret and support congressional enactments. Congress is not an administrative agency that is required to state the grounds upon which it acts, and courts do not interfere with the powers of Congress when exercising their judicial power to interpret federal statutes. *Cf. Securities and Exchange Commission v. Chenery Corporation,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *id.,* 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). It is not

---

ganizations to spend the fruits of their special tax status in ways that Congress finds to be consistent with the purposes for which that status was created, *i.e.,* to further charitable and educational purposes. *See* discussion at 752–753 *infra.*

**18.** The other asserted governmental interest was protection of residents' privacy from the intrusions of door-to-door solicitors. 444 U.S. at 638-39, 100 S.Ct. at 837–38.

**19.** The nature of the governmental interest expressed by the lobbying restriction is more fully discussed at 752–753

**20.** The Supreme Court recently reaffirmed the appropriateness of the *O'Brien* standard in cases not involving content-based restrictions. *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 540 n.9, 100 S.Ct. 2326, 2335 n.9, 65 L.Ed.2d 319 (1980).

necessary in its legislative record for Congress to explain every provision of every statute and foresee every argument that may be asserted in support of or against its enactments. This is as true in the first amendment context as it is elsewhere. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 106, 96 S.Ct. 612, 676, 46 L.Ed.2d 659 (1976). Although the fact is often forgotten, statutes can often be interpreted by reference to their plain terms without reference to extraneous sources. This is such a statute. Read in the context of the plain purpose of section 501—to benefit certain groups performing various services that Congress views as being in the public interest[21] —subsection (c)(3) clearly indicates a congressional intent to encourage certain activities viewed as charitable and educational.

The lobbying restriction, since it cannot successfully be attacked on the ground that it discriminates among organizations based upon the content of their speech, can only sensibly be read as an attempt to confine such groups to purposes that are directly charitable or philanthropic. As Judge Wilkey has stated, the lobbying restriction in section 501(c)(3) *"is aimed at assuring some purity in that purpose."*[22] Similarly, a committee report interpreting the provision shortly after its original enactment stated:

> The exemption . . . is based upon the theory that the Government is compensated for the loss of revenue by its relief from financial burden which would otherwise have to be met by appropriations from other public funds . . .

H.R.Rep.No.1860, 75th Cong., 3d Sess. 19 (1938). Congress could reasonably conclude that limiting the lobbying activities of educational and charitable organizations was a proper means of ensuring that the benefits these organizations produce will be received by the intended beneficiaries.

Although it is unnecessary, in the absence of evidence indicating a contrary intention, to seek further justification in the legislative history for the lobbying restriction, it merits noting that contrary to Taxation's claims, there is a strong indication of Congress' intent in imposing that regulation. The floor debate on amendments to the Revenue Act of 1934, in which section 501(c)(3) (section 23(*o*) of the 1934 Act) has its origin, contains discussion the significance of which cannot be obscured by its brevity.

In a colloquy between Senator Reed of Pennsylvania and Senator Harrison, the concern was raised that the language restricting propaganda and attempts to influence legislation—the precise language found in the statute today—would have the effect of denying exempt status to organizations such as "the Society for the Prevention of Cruelty to Children, or the Society for the Prevention of Cruelty to Animals, or any of the worthy institutions that we do not in the slightest mean to effect." 78 Cong. Rec. 5861 (1934) (remark of Sen. Reed). Although he specifically noted and endorsed this desire on the part of Congress to protect the activities of such philanthropic groups, Senator Reed voiced the position of the Senate Finance Committee that "[t]here is no reason in the world why a contribution . . . should be deductible as if it were a charitable contribution *if it is a selfish one* made to advance the personal interests of the giver of the money. *That is what the committee was trying to reach . . ." Id.* (emphasis added).[23] Despite the fact that Senator Reed personally favored a

---

**21.** A survey of the various exemptions stated in § 501(c) will reveal the general types of interests Congress sought to protect. *See* I.R.C. § 501(c)(1)–(22).

**22.** *"Americans United," Inc. v. Walters*, 477 F.2d 1169, 1183 (D.C.Cir.1973) (concurring opinion), *rev'd on jurisdictional grounds sub nom. Alexander v. "Americans United" Inc.*, 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974) (emphasis in original). *See also Bob Jones University v. Simon*, 416 U.S. 752, 772 &

n.8, 94 S.Ct. 2038, 2044 & n.8, 40 L.Ed.2d 496 (1974) (Blackmun, J., dissenting); *Haswell v. United States*, 500 F.2d 1133, 1150 (Ct.Cl.1974).

**23.** The majority suggests that "it would be grossly simplistic" to attribute much significance to this exchange. Majority op. at 736. Since I take the view that this evidence only confirms the intent obvious from the face of the statute, extended discussion of the proper weight to be accorded it is unnecessary.

narrower restriction, Congress, having before it the above interpretation by a leading member of the committee charged with responsibility for tax matters, adopted the language presently found in section 501(c)(3). Even if the statutory language were thought to leave substantial doubt about the purpose sought to be achieved by the lobbying restriction, this revealing history resolves any question about the intent of Congress in adopting it.

Thus interpreted, it is beyond question that the lobbying restriction serves an "important and substantial" interest of the United States. The encouragement of charity, education, and similar objectives through the tax system, like that achieved by direct congressional appropriations for such purposes, is an interest whose legitimacy cannot seriously be doubted. The interests served by the activities of the organizations enumerated in section 501(c)(3) are well within both the power of Congress to serve the public interest and the traditional scope of the exercise of that power.

### 2. The Scope of the Restriction

Taxation's final argument against section 501(c)(3) is that, even conceding the government to have an important and substantial interest that is served by the restriction, the restriction is invalid because it is broader "than is essential to the furtherance of that interest." *United States v. O'Brien, supra,* 391 U.S. at 377, 88 S.Ct. at 1679. Even where a restriction on speech is not directed at content, the first amendment imposes the requirement that government adopt the means of achieving its purpose that is least restrictive of first amendment interests. *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 636, 100 S.Ct. 826, 835, 63 L.Ed.2d 73 (1980).

Taxation's argument is based upon the fact that *all* tax benefits emanating from section 501(c)(3) are denied to any organization a "substantial part of the activities of which" is lobbying. This, Taxation alleges, renders the restriction broader than necessary to achieve Congress' purpose, in that if Congress sought only to deny tax benefits to organizations engaged in "selfish" activity, and so to deny deductibility to their contributors, the achievement of that end requires only that *that portion* of contributions *actually used* for the prohibited "selfish" purposes be treated as nonexempt and non-deductible. The remainder of the funds, used for purposes not expressly forbidden, would continue to qualify for exemption and deductibility.

The accuracy with which government defines categories of citizens for the purposes of regulation is a matter of particular importance when first amendment interests are at stake. *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Courts in such circumstances are not relieved, however, of their duty to respect the superior competence and concomitant authority of the legislature in devising means of regulation. As was held in *Buckley v. Valeo,* 424 U.S. 1, 30, 96 S.Ct. 612, 640, 46 L.Ed.2d 659 (1976), "Congress' failure to engage in such fine tuning does not invalidate" legislation, even where the legislation in question burdens first amendment freedoms of speech and association. *See also id.* at 83, 103, 96 S.Ct. at 665, 675.[24] It has long been recognized that this deference to legislative competence is particularly appropriate where the regulation involved is a system of taxation. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 41, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973); *Madden v. Kentucky,* 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590 (1940).

24. Judges and commentators have frequently noted the dangers inherent in judicial attempts to refine regulatory schemes, even where undertaken in order to enforce compliance with the first amendment. *See, e.g., Central Hudson Gas & Electric Corp. v. Public Service Comm'n, supra,* 447 U.S. at 599–606, 100 S.Ct. at 2368–2371 (1980) (Rehnquist, J., dissenting); Cox,

*The Supreme Court, 1979 Term—Foreword: Freedom of Expression in the Burger Court,* 94 Harv.L.Rev. 1, 35 (1980) (questioning the "close judicial analysis of policy alternatives [in *Central Hudson*], with the burden put upon the state to foresee and negate all the alternatives that the Court can imagine ...").

I reach the same conclusion as the majority and view the Code as a whole as a scheme of regulation that is sufficiently narrow to satisfy first amendment concerns. In my opinion, the recent enactment of section 501(h) of the Code provides an insight into Congress' choice of means in regulating charities that compels the conclusion that section 501(c)(3) is valid.[25]

Before proceeding to a discussion of the terms of section 501(h) and their relationship to section 501(c)(3), it is important to note the significance of that relationship. Section 501(h) is the product of an extensive effort by Congress to establish precise limits on the political activity of charitable organizations.[26] In effect, *section 501(h) constitutes the congressionally-engineered "less restrictive alternative" to the lobbying restriction in section 501(c)(3).* Rarely are courts in our position presented with such a ready-made, legislatively-created solution to the sort of first amendment problem raised here. We should therefore recognize that this action by Congress is entitled the great weight.

In addition to this prudential aspect of the relationship between the two subsections, there is an important logical connection. On the one hand, if section 501(h) truly offers a less restrictive alternative than section 501(c)(3) to organizations like Taxation, Taxation's remedy is to proceed under subsection (h) rather than under (c)(3).[27] If, on the other hand, section 501(h) is an *equally* or *more* restrictive means of confining charities to their proper purposes, one should be extremely reluctant to hold that Congress can and must produce a still better resolution of the competing interest than it has in either 501(h) or 501(c)(3). Bearing in mind the effort Congress has made to resolve these interests precisely, and this court's limited authority to second-guess that determination, I proceed to an examination of the purpose and effect of section 501(h).

Section 501(h) was enacted as part of the Tax Reform Act of 1976, Pub.L.No.94–455 § 1307, 90 Stat. 1720 (1976). It permits organizations described in section 501(c)(3) to opt out of regulation under the "substantial part" standard of (c)(3) and come under precise quantitative limitations on the amount they may spend on influencing legislators ("lobbying expenditures") and the public ("grass roots expenditures"). I.R.C. § 501(h)(2)(A), (C). Generally speaking, any section 501(c)(3) organization that is not a church may so elect. I.R.C. § 501(h)(5). By electing to be treated under section 501(h), an organization is permitted, subject to certain disclosure requirements, to expend on lobbying and "grass roots" political activity up to 25% of the

25. The parties did not focus on the significance of § 501(h) in their arguments before this court. Taxation's ability and willingness to elect coverage under § 501(h), *see* discussion at 755–756 *infra*, need not be considered, however for we rely on that section not simply as affording Taxation a less restrictive alternative in fact, but also as a source of guidance in evaluating the existing scope of § 501(c)(3).

26. At least as early as 1972, Congress held hearings on the problems posed by § 501(c)(3)'s lobbying restriction. *See* Legislative Activity by Certain Types of Exempt Organizations: Hearings Before the House Comm. on Ways and Means, 92d Cong., 2d Sess. (1972). Several bills were introduced in earlier sessions on the subject prior to the ultimate adoption of section 501(h) by the 94th Congress in Pub.L.No. 94–455, 90 Stat. 1520 (1976). *See* H.R.Rep.No. 94–1345, U.S. Code Cong. & Admin.News 1976, p. 5433, 122 Cong. Rec. 16886 (June 8, 1976). According to Congressman Ullman, the sponsor of the bill that

ultimately became § 501(h), "further decisions were made in committee markup sessions in 1974 ... Throughout 1975, the Treasury Department, many of the charitable organizations interested in these proposals, and representatives of major religious organizations all joined with staff members to reach agreements ..." *Id.*

(Although section 501(h) and its related provisions were passed as part of the Tax Reform Act of 1976, Pub.L.No. 94–455, the tax writing committees of both houses originally considered the measure as a separate bill, H.R. 13500. *See* H.R.Rep.No. 94–1210, U.S.Code Cong. & Admin.News 1976, p. 6640; S.Rep.No. 94–938, S.Rep.No. 94–1236, U.S.Code Cong. & Admin.News 1976, p. 2897, (conference report) (all 94th Cong., 2d Sess. (1976)).

27. Taxation has declined to do so. We discuss the significance of this decision at 755–756, *infra.*

amount it spends on exempt purposes specified in section 501(c)(3).[28] Expenditures in excess of this ceiling amount result in the imposition of a 25% tax on the excess. I.R.C. § 4911(a)(1).

The history of attempts to clarify and quantify the limits on the political activity of exempt organizations which culminated in the adoption of section 501(h) in 1976 is a fine example of congressional activity in response to first amendment concerns. The features of section 501(h) and its related provision, section 4911, combine to satisfy any valid objection that Taxation may have to the lobbying restriction. First, they represent a clear statement of Congress' understanding of the relationship between charitable purposes and political activity. Any ambiguity of purpose claimed to underlie the section 501(c)(3) lobbying restriction, see Taxation Br. at 16; majority op. at 736, is resolved by section 501(h)'s treatment of the subject.[29] Second, Taxation's objection that section 501(c)(3) denies *all* tax benefits to an organization that does *some* (i.e., a more than an insubstantial amount of) lobbying, is addressed by section 4911's 25% tax on excess lobbying expenditures. I.R.C. § 4911(a). The loss of tax benefits is, under this system, directly proportional to the extent of the organization's lobbying activity, eliminating the alleged "massive overkill" effect of section 501(c)(3). See Taxation Br. at 17. Finally, the legislative history and structure of section 501(h) illustrates the weakness of the claim, see Taxation Br. at 15, that Congress is seeking to regulate speech because of its communicative impact.[30]

It remains to be considered whether the availability of the section 501(h) alternative is relevant here. I believe that it is, notwithstanding the fact that Taxation has elected not to come under that section's coverage.

As noted previously, the chief significance of section 501(h) for the purposes of this case lies in the fact that it represents a recent congressional enactment to meet the problems that Taxation now raises. The statute indicates (1) that Congress finds that legislative lobbying activity might be compatible with charitable purposes to a *limited* extent, and (2) that any charitable organization wishing to engage in legislative activity should, in the judgment of Congress, be subject to well-defined regulatory limits on their lobbying activities. Whether or not an organization chooses to elect coverage under section 501(h), these congressional determinations must be respected.

Although Taxation from all indications in the record would qualify for treatment under section 501(h), it testified before the District Court that it elected not to be so treated:

> [Taxation] has not made and does not plan to make, an election under sections 501(h) and 4911 of the Code. Such an election might require us to accept restrictions which are not justified or authorized under the First Amendment of the Constitution, on our right to communicate with our contributors and members regarding matters of legislative interest. Sections 501(h) and 4911 also fail to define with any narrow specificity such terms as "legislative activities" and "tax-

---

**28.** I.R.C. § 4911(c) sets forth the formulae for determining the maximum expenditures permitted.

**29.** Congress in facing the question of legislative activity by exempt organizations could have chosen to repeal the lobbying restriction. This it declined to do, suggesting that doubts about the purpose of that section as adopted in 1934 are largely misconceived.

**30.** Particularly noteworthy is § 4911's "sliding scale" definition of the permitted level of political expenditures. This provision was included as an alternative to the § 501(c)(3) "substantial

part" test, which created the possibility that two organizations of different size which spend the same dollar amount on lobbying would be treated differently because that amount bears a different relationship to the *total* expenditures of the organizations. See 122 Cong.Rec. S16884 (daily ed. June 8, 1976); see also *"Americans United," Inc. v. Walters*, 477 U.S. 1169, 1173 (D.C.Cir.1973), *rev'd on jurisdictional grounds sub nom. Alexander v. "Americans United" Inc.*, 416 U.S. 752, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974).

able expenditures". For this reason, an election under section 501(h) might require us to impose prior restraints on the publication of Articles in our weekly tax news-magazine, Tax Notes. An election under section 501(h) might also require us to accept limitations on our legislative activities which we believe are unconstitutional and which are not imposed on similarly situated tax exempt organizations, such as, for example, trade associations, fraternal societies, labor unions, veterans organizations, and in practice, churches. In addition, the income of an organization such as Taxation with Representation of Washington normally fluctuates widely from year to year. Therefore as a practical matter, a percentage test—such as that in section 501(h)—to determine the permissible level of spending on legislative activities is unworkable.

Field Aff. at 2–3 (J.A. at 15–16).

Except for the same complaints of discriminatory treatment that it raises in this case, Taxation's alleged reasons for choosing to remain under section 501(c)(3) amount to conclusory objections to (1) the specificity of statutory terms in sections 501(h) and 4911, and (2) the "workability" of a quantitative expenditure limitation. These questions regarding section 501(h) are obviously not suited for resolution here.[31] However, we do not believe that this precludes us from recognizing the existence of the statute or the congressional determinations that it represents. Although Taxation cannot be compelled to elect coverage under section 501(h), this does not mean that its present case must be evaluated as if that statutory alternative did not exist.

From the foregoing, it is submitted that Congress has legitimately drawn a distinction between charitable organizations that engage in substantial lobbying and those that do not. The restrictions to which an organization is subject depend upon the extent of its exercise of the right to lobby, but

in any event, those restrictions serve a clearly valid public interest and are drawn with sufficient precision to comport with the requirements of the first amendment.

### III.

Next to be considered is Taxation's second claim that imposing the lobbying restriction on the activities of section 501(c)(3) organizations, while placing no similar restriction upon fraternal organizations exempted by sections 501(c)(8) and (10) or veterans' groups exempted by section 501(c)(19), discriminates against Taxation in a constitutionally impermissible manner. This claim is similarly rejected.

Recent legislative attempts to deal with the complex relationship of money, politics, and constitutional guarantees have provided the Supreme Court with several opportunities to set forth the standards applicable here. Those standards support the conclusion that Congress has acted consistently with the requirements of the first amendment.

In evaluating any claim of unlawful discrimination, whether under the constitutional strictures of the first, fifth and fourteenth amendments or under some other provision of law, it must be remembered that "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike . . ." *Buckley v. Valeo*, 424 U.S. 1, 97–98, 96 S.Ct. 612, 672–673, 46 L.Ed.2d 659 (1976), *quoting Jenness v. Fortson*, 403 U.S. 431, 441–42, 91 S.Ct. 1970, 1975–76, 29 L.Ed.2d 554 (1971). It cannot simply be presumed that two parties, one of who complains of treatment different from that received by the other, are situated so similarly that the difference rises to the level of "discrimination." Obviously, differential treatment of members of *different* classes of persons cannot be equated with differential treatment of persons identically situated. Con-

---

**31.** It is noted that Taxation, while adverting in its affidavit to the alleged vagueness of terms used in §§ 501(h) and 4911, raised no similar vagueness objections to § 501(c)(3). Consider-

able deference should also be paid to the specific quantitive standards set forth in the statute. *See Buckley v. Valeo*, 424 U.S. 1, 30, 83, 96 S.Ct. 612, 640, 665, 46 L.Ed.2d 659 (1976).

stitutional scrutiny of an alleged "discrimination," in short, presupposes that the essential characteristics of the complaining party are in the main indistinguishable from the characteristics of those who are alleged to be treated more favorably. Equal protection does not require that "things which are different in fact ... be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940).

We take it as beyond dispute that were Congress to preserve the existing benefit provisions favoring veterans' organizations while *wholly eliminating* those afforded other charitable organizations, Taxation would be without a colorable claim of discrimination under the first or fifth amendments.[32] Generally speaking, Congress is free, subject to the minimal constraint of "rationality,"[33] to determine that veterans' groups are worthy of those benefits while other groups with charitable or educational purposes are not. The fact that veterans' organizations would be permitted to engage in lobbying among their other activities[34] would not be cause for Taxation to complain of congressional discrimination favoring veterans' speech over its own. Government is free to choose the interests to which it offers support via the tax structure, even if as a result some groups are able to exercise their speech rights at a lower effective cost than are others.[35]

The foregoing would not establish the constitutionality of a measure that conditioned receipt of a benefit by one group over another on the basis of particular political views or interests, nor that of one which imposed a direct burden on protected speech. What it does establish, however, is that when Congress determines that two organizations serve significantly different purposes, or present significantly different regulatory problems, the Constitution does not require it to afford them identical treatment.

The fatal defect in the majority opinion is its failure to recognize the different regulatory considerations presented by veterans' groups[36] and 501(c)(3) organizations. The majority adopts the tacit assumption that, but for the lobbying restriction, Taxation is for all relevant purposes legally indistinguishable from veterans' groups. The majority therefore draws the conclusion that the difference in treatment permitted by that restriction is discrimination touching on the fundamental right of free speech. I disagree strongly with the assumption that Taxation and veterans' groups are identically situated with respect to the purposes of Congress in conferring these tax benefits, and consequently cannot accept the conclusion the majority draws from it.

The majority appears to view veterans' organizations simply as 501(c)(3) organizations which happen for purely technical reasons to occupy a separate Code subsection, 501(c)(19). That view ignores both Congress' own understanding of the Tax Code's provisions and the unique character, status and function of veterans' groups under the laws of the United States. Insofar as these reveal important differences between veterans' groups and charitable or educational groups in general, nothing in the first or fifth amendments forecloses Congress from legislating on the basis of those differences

---

**32.** *See*, maj.op. Part IIA.

**33.** *See New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam).

**34.** Assuming the absence of other congressional limits upon such activity. Limits of this sort in fact presently exist with respect to veterans' organizations chartered by Act of Congress. *See, e.g.*, 36 U.S.C. § 90f (1976) (DAV shall be nonpolitical and may not support any candidate for office). There are discussed at 760–761 *infra*.

**35.** A contrary rule would place upon government the obligation of providing equal resources to all who would publish their views on any subject. That no such obligation exists is obvious, as the majority notes. Maj.op. at 726.

**36.** Because the majority appears to agree that the statute read in conjunction with Treasury regulations does in fact restrict the lobbying activities of fraternal societies in a fashion similar to § 501(c)(3), this discussion is confined to Taxation's claims regarding veterans' groups.

as it has done here. Far from being essentially fungible charities, Taxation and veterans' groups are fundamentally different in their purposes, their operations, and their responsibilities under the law. Those differences lead to the conclusion that Taxation has not been subjected to unconstitutional discrimination.

The fact that veterans' groups are treated in a statutory provision (501(c)(19)) distinct from the general exemption for charitable and educational organizations in section 501(c)(3) itself tends to suggest that Congress viewed these groups as essentially different types of organizations. The majority attributes this separate treatment to purely technical reasons, namely, the need to insulate veterans' organizations from the tax imposed on unrelated business income by the Tax Reform Act of 1969. Maj. op. at 734. See S.Rep.No.92–1082, 92d Cong., 2d Sess. (1972); H.R.Rep.No.92–851, 92d Cong., 2d Sess. (1972). That attempted explanation is not sufficient.

First, it appears that at the time it enacted section 501(c)(19), Congress viewed veterans' organizations as falling *outside* the scope of section 501(c)(3). In stating their understanding of the existing law, the committee reports on section 501(c)(19) stated only that veterans' groups qualified as "social clubs" under section 501(c)(7) or as "social welfare organizations" under section 501(c)(4).[37] At the time Congress enacted 501(c)(19), then, it believed that veterans' groups were not classified with Taxation as 501(c)(3) groups subject to the lobbying restriction.[38] It viewed veterans' organizations as falling into a class with groups entitled to enjoy tax-exempt status without any restriction on their political activities.

Second, the legislative evolution of the specific provisions for income, gift and estate tax deductions of contributions shows that Congress, having originally extended the benefits of exempt status and deductibility to all types of charitable and educational groups, subsequently determined to withdraw it only from section 501(c)(3) organizations that engaged in substantial attempts to influence legislation.[39] The basis for that decision need not be set forth explicitly for it to be entitled to this court's respect, but the previously quoted debate on that action shows that Congress was cognizant of the distinction it was drawing.

This evolution of the present section 501(c)(3)—first extending the benefits of exemption and deductibility, later paring them back—is precisely the sort of response to social experience and legislative experiment that the Supreme Court has held most worthy of judicial deference. Contrary to the majority opinion, the rule that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind" [40] is fully applicable to this case notwithstanding the presence of first amendment concerns. That is the unmistakable meaning of the Supreme Court's holding in *Buckley v. Valeo, supra,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

The condition placed upon exempt status which now appears in § 501(c)(3) was adopted in order to complement the denial of deductions for contributions to groups that lobby that is now § 170(c)(2)(D). See S.Rep.No. 558, 73d Cong., 2d Sess. 30 (1934) (explaining change in exemption rules under the 1939 Code (prior § 101(6) by reference to change in deductibility under prior § 23(o) ). This fact further supports the view that the principal intent of Congress in imposing the lobbying restriction was to curtail self-serving "donations" incompatible with the charitable purposes Congress sought to further.

37. H.R.Rep.No. 92–851, 92d Cong., 2d Sess. 2 (1972); S.Rep.No. 92–1082, 92d Cong., 2d Sess. 2 (1972), U.S.Code Cong. & Admin.News 1972, p. 3142.

38. Given this recent interpretation by Congress, the pre-1934 legislative history cited by the majority, maj. op. at 732–733, is of little value. Whatever one might make of the "prehistory" of the lobbying restriction, since 1934 Congress has without deviation taken the view that veterans' organizations and section 501(c)(3) organizations are essentially different in character.

39. The initial focus of the decision to deny these benefits to groups that lobbied was not upon the organizations' exempt status, but upon the deductibility of contributions to them.

40. *Williamson v. Lee Optical,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

In *Buckley*, the Court was presented with a challenge to various features of the Federal Election Campaign Act of 1971, 2 U.S.C. § 431 *et seq.* (1976). Among the issues there presented was the claim that the provision of the Act providing for federal funding of primary election campaigns, which allowed no funds to candidates for office who did not run in primary elections, unconstitutionally discriminated against those candidates in violation of the first and fifth amendments. The Court rejected this challenge, holding that the different treatment was justified in view of Congress' power to structure the conduct of federal elections. The Court stated:

> [I]n deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' *Roschen v. Ward*, 279 U.S. 337, 339 [49 S.Ct. 336, 73 L.Ed. 722], that a legislature need not 'strike at all evils at the same time,' *Semler v. Dental Examiners*, 294 U.S. 608, 610 [55 S.Ct. 570–571, 79 L.Ed. 1086], and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563].

424 U.S. at 105, 96 S.Ct. at 675, *quoting Katzenbach v. Morgan*, 384 U.S. 641, 647, 86 S.Ct. 1717, 1721, 16 L.Ed.2d 828 (1966) (footnote omitted).[41] In a footnote to this statement, the Court made explicit its holding that this understanding of Congress' power was fully applicable in first amendment cases of precisely the character that is present here. *See id.* 424 U.S. at 105 n. 143, 96 S.Ct. at 675 n. 143.

The statute at issue in *Buckley* was an attempt by Congress to regulate the effects of massed private wealth upon federal elections. As such, it presented concerns lying at the very heart of the political freedom protected by the first amendment. The regulation imposed by section 501(c)(3) can hardly be said to pose an equally or still more serious threat to those values.

When the specific actions of Congress relative to the status of veterans' groups, including its regulation of their political activities, are examined more closely than the majority is apparently willing to do, this conclusion is even more evident. Congress' decision in 1934 to limit the lobbying restriction to 501(c)(3) organizations—to take "one step at a time"—is amply supported by the contemporary and continuing "fact of American life" [42] regarding the unique status of veterans' organizations in our society. In view of this familiar social fact, Congress was clearly justified in focusing its attention on what it perceived to be the most serious abuse of the tax-exempt organization statutes, namely, the activities of the generally-described organizations presently defined in section 501(c)(3).[43]

War veterans have made unparalleled contributions to the creation and preserva

---

**41.** The Court in *Buckley* cited the Campaign Act's character as a "reform" measure, *id.* 424 U.S. at 105, 107, 96 S.Ct. at 675, 676. The courts have long recognized, as the already cited legislative history itself makes clear, that section 501(c)(3) is a similar sort of remedial measure. *See, e.g., Seasongood v. Commissioner*, 227 F.2d 907, 910 (6th Cir. 1955); *"Americans United," Inc. v. Walters*, 477 F.2d 1169, 1183 (D.C.Cir.1973) (Wilkey, J., concurring), *rev'd on jurisdictional grounds sub nom. Alexander v. "Americans United" Inc.*, 416 U.S. 752, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974). The status of an Act of Congress as a "reform" measure is a question to be determined by reference to the intent evidenced by Congress in adopting it, and not to the predilections of a reviewing court. "Evils in the same field may be of different dimensions and proportions, requiring different remedies. *Or so the legislature may think." Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) (emphasis added).

**42.** *Buckley v. Valeo*, 424 U.S. at 98, 96 S.Ct. at 672.

**43.** The fact that the reform implemented by the lobbying restriction was first adopted in 1934 does not undermine its status as a proper "first step." The various statutory changes adopted since that time—the enactment of sections 501(h) (discussed at 753–755 *supra*) and 527 (regulating political action committees)—illustrate the continuing attention paid by Congress to this area in the intervening years.

tion of this nation. Their organizations have existed in this country from the beginning. These organizations have sought to aid disabled veterans, to assist their widows and orphans, and to provide for mutual support and assistance among those who served their country in time of war. *See generally* W. Glasson, Military Pension Legislation (1900). Some of these organizations play a vital continuing role in the administration of laws benefitting veterans, as Congress has specifically recognized and provided for. *See, e.g.,* 38 U.S.C. § 3402(a) (1976) (permitting veterans' organizations to represent veterans in presenting claims to Veterans' Administration and the furnishing of office space to them). The close coordination between veterans' organizations and the government is unique. Congress has continued to acknowledge the importance of veterans' organizations by incorporating them with federal charters in order to permit them to carry out their philanthropic purposes. *See, e.g.,* Pub.L. No.97–83, 95 Stat. 1094 (Nov. 20, 1981) (chartering United States Submarine Veterans of World War II).[44] Because of the important and unique public role played by veterans' groups, Congress could properly regard them as a different kind of entity deserving *tax* treatment different from that accorded the more generally described charitable organizations subject to section 501(c)(3).

It could do this, as *Buckley* demonstrates, even though a perceived effect of the different treatment might be the creation of an indirect burden on other groups' first amendment interests. *Buckley* presented a regulatory provision which made the receipt of a financial benefit (campaign funding)

contingent upon the past success of a candidate in primary elections.[45] That case, much more so than this one, tested a statute which made political success—and therefore, the content and consequent popularity of one's political ideas—a condition on the receipt of a benefit. The Court nevertheless upheld the provision as one enacted "in furtherance of sufficiently important governmental interests" with little practical impact on the rights of the parties disadvantaged thereby. 424 U.S. at 95–96, 96 S.Ct. at 971–72. Finding it evident that here, as there, "there are obvious differences in kind"[46] between veterans' organizations and section 501(c)(3) organizations, in my judgment the decision to restrict the lobbying activities of section 501(c)(3) organizations by placing a condition upon their receipt of tax benefits, without placing an identical condition upon veterans' organizations, was within the power of Congress.

Finally, it must be stressed that Congress *has in fact acted* to limit the lobbying and other political activities of the nation's more prominent veterans' groups, including the American Legion and AMVETS. The statutes governing these and other organizations of veterans chartered by Congress uniformly contain provisions barring them from engaging in partisan political activity and otherwise limiting the political involvements they may pursue. In incorporating the Disabled American Veterans, for example, Congress provided that it "shall be *nonpolitical* and nonsectarian, and as an organization shall not promote the candidacy of any person seeking public office." 36 U.S.C. § 90f (1976) (emphasis added).[47] In-

---

**44.** Other veterans' organizations are similarly incorporated. *See* note 47 *infra.*

Under standards adopted by the House and Senate Judiciary Committees, federal charters are granted only to organizations of "unique character," and which are "organized and operated solely for charitable, literary, educational, scientific, patriotic or civic improvement purposes . . . as nonpartisan and nonprofit organization[s] . . ." S.Rep.No. 97–37, 97th Cong., 1st Sess. 2 (1981).

**45.** *Buckley v. Valeo,* 424 U.S. at 97, 96 S.Ct. at 972.

**46.** *Id.*

**47.** *See also* 36 U.S.C. § 46 (1976) (American Legion "shall be nonpolitical and, as an organization, shall not promote the candidacy of any person seeking public office"); *id.* § 67d ("No part of the activities of [American Veterans of World War II] shall consist of carrying on propaganda" or of supporting any political party or candidate); *id.* § 86 (Blind Veterans of World War I "shall be nonpolitical and shall not be used for the dissemination of partisan principles"); *id.* § 1153 (Paralyzed Veterans of America).

deed, most recently Congress has imposed charter restrictions, *identical* to the restrictions of section 501(c)(3), upon the United States Submarine Veterans of World War II and the Italian American War Veterans of the United States. Their charters were granted in 1981 by Congress subject to the restriction that they "shall not contribute to, support or otherwise participate in *any* political activity *or in any manner attempt to influence legislation.*" [48]

To the extent that such direct limitations on the activities of veterans' organizations exist it is not even necessary to consider the extent to which the different treatment accorded them and section 501(c)(3) organizations within the provisions of the Tax Code is justified by the government's interest in veterans' affairs. For to that extent, veterans' groups operate under constraints essentially similar or even identical [49] to those imposed by section 501(c)(3) upon groups like Taxation, and hence no true "discrimination" in their favor occurs.[50] As the Supreme Court recently stated in *California Medical Association v. Federal Election Commission*, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981), in upholding section 320(a)(1)(C) of the Federal Election Campaign Act,

> We have already concluded that § 441a(a)(1)(C) does not violate the First Amendment. In order to conclude that it nonetheless violates the equal protection

component of the Fifth Amendment, we would have to find that because of this provision the Act burdens the First Amendment rights of persons subject to § 441a(a)(1)(C) to a greater extent than it burdens' the same rights of corporations and unions, and that such differential treatment is not justified. *We need not consider this second question—whether the discrimination alleged by appellants is justified—because we find no such discrimination.* Appellants' claim of unfair treatment ignores the plain fact that the statute as a whole imposes far *fewer* restrictions on individuals and unincorporated associations than it does on corporations and unions.

*Id.* 101 S.Ct. at 2724 (first emphasis added).

The restrictions imposed on the political activity of most veterans' organizations show that Congress has consistently responded to any perceived 'impurity' in the philanthropic purposes of those organizations.[51] The fact that it has chosen to do so by means other than an amendment to the Tax Code does not lessen the respect we owe its judgment. Congress is free not only to take "one step at a time" in solving a perceived problem, but also to choose different forms of solutions to such problems. "That first amendment interests are implicated should begin, not end our inquiry." *Citizens Against Rent Control v. City of*

---

**48.** Pub.L.No. 97–82 § 8(c), 95 Stat. 1092 (Nov. 20, 1981); Pub.L.No. 97–83 § 8(c), 95 Stat. 1095 (Nov. 21, 1981) (emphasis added).

**49.** *See id.*

**50.** This is most clearly the case in the instance of contributions sought to be deducted from the estate tax under section 2055(a)(4). That section makes contributions to veterans' organizations deductible only if the contribution is "to or for the use of any veterans' organization *incorporated by Act of Congress ...*" Any conditions placed upon the political activities of these groups in their corporate charters, then, are *explicitly* incorporated into the provision governing the deductibility of contributions, and the effect is as if section 2055 itself imposed the restriction on political involvement.

**51.** I fail to see the relevance to the lobbying restriction here under scrutiny of the majority's assertion that one veteran's organization "en-

dorsed a presidential candidate in the 1980 election." Maj. op. at 723 n.15. In actuality, it appears from the cited news source that it was a *Political Action Committee* formed by members of a veteran's organization that made the endorsement. (Wash.Post, Jan. 17, 1980). *See* N.Y. Times, Aug. 9, 1980, at 6 ("*To avoid risking its tax-exempt status,* the V.F.W. last year created a separate political action committee to back candidates." (emphasis added)). In view of the various restrictions imposed upon such committees, both under the Federal Election Campaign Act, *e.g.,* 2 U.S.C. § 441a(a)(1)(C) (1976) *and under the Tax Code itself, see* 26 U.S.C. § 527, the majority's comment is of no moment. Indeed, the restrictions imposed upon political committees go further to demonstrate the close attention given these concerns by Congress.

*Berkeley,* —— U.S. ——, ——, 102 S.Ct. 434, 444, 70 L.Ed.2d 492 (1981) (White, J., dissenting). As the Court stated in *California Medical Association,* even within the area of regulations touching on protected speech, Congress may determine "that these entities have *differing structures and purposes,* and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process." 101 S.Ct. at 2724 (emphasis added).

### IV.

There is unanimous agreement that the lobbying restriction in section 501(c)(3) does not impose an unconstitutional burden upon the exercise of Taxation's first amendment rights. The majority holds, however, that by not imposing upon veterans' organizations an identical restriction—the threat of losing their tax benefits under the Internal Revenue Code—Congress unconstitutionally discriminated against Taxation.

In my opinion, that holding fails to accord Congress the respect it is due, even in areas where regulation may place an indirect burden on first amendment interests, when legislating to insure that the public interest is best served. To the extent it ignores the fact that Congress has used means besides the tax system to regulate the otherwise fully protected political activity of veterans' groups, the majority leaps peremptorily past the threshold question of whether section 501(c)(3) groups are in fact discriminated against *at all. California Medical Association v. FEC, supra.* To the extent that it fails to take cognizance of the gradual development of the law governing political activity by exempt organizations which began with the passage of the lobbying restriction in 1934 *and which continues into the present* [52]—with explicit solicitude for the first amendment interest at stake—the majority fails to afford Congress the respect due it in this field of endeavor. *Buckley v. Valeo, supra.*

Veterans' organizations are essentially different in character from other charitable and educational groups. They are particularly distinguishable from organizations like Taxation that are avowedly incorporated and operated chiefly or exclusively for the purpose of lobbying Congress on matters of public finance. Congress, in any event, was clearly justified in drawing that distinction, and in treating what it perceived to be abuses of the tax laws as it has here. Section 501(c)(3) accomplishes that objective in a wholly content-neutral way, and is therefore consistent with the constraints of the first amendment.

While the majority attributes the system of regulation here challenged to simple congressional "inadvertence," maj. op. at 731, I would afford it the respect dictated by *Buckley* and counseled by a long and sorry history of judicial forays into the legislative province. Here, Congress has treated veterans' groups differently from the vast undifferentiated mass of organizations claiming educational and charitable purposes. It has recognized that veterans' groups are unique entities having "differing structures and differing purposes, and that they therefore may require different forms of regulation . . ." *California Medical Association, supra,* 101 S.Ct. at 2724. Nothing in the majority opinion is persuasive either of the incorrectness of that conclusion or of Congress' lack of authority to legislate on the basis of it.

I therefore respectfully dissent.

ROBB and WILKEY, JJ., join herein.

---

52. *See* 760–761 *supra.*